Macri v. Macri                          CV-01-464-JD  05/01/02
            UNITED STATES DISTRICT COURT FOR THE
                    DISTRICT OF NEW HAMPSHIRE


Vincent J. Macri and Equichem
Research Institute, Ltd.

     v.                                  Civil No. 01-464-JD
                                         Opinion No. 2002 DNH 089
James N. Macri and NTD Labs., Inc.


                          O R D E R


     The plaintiffs, Vincent Macri and Equichem Research

Institute, Ltd., bring an action arising out of their failed

business relationship with the defendants, James Macri and NTD

Labs.  The plaintiffs allege claims of misappropriation, unfair

competition, unjust enrichment, breach of contract, and copyright

infringement.  The plaintiffs also seek injunctive relief.  The

defendants move to dismiss the action, asserting that the court

lacks personal jurisdiction and that the plaintiffs failed to

state a claim for which relief can be granted, pursuant to

Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).

Alternatively, the defendants move to transfer the action to the

United States District Court for the Eastern District of New

York, pursuant to 28 U.S.C. § 1404(a).

<u>Background</u>[1]

Defendant NTD, a New York corporation located in Huntington Station, New York, was founded in 1983. The parties dispute whether NTD was founded independently by the defendant, James Macri ("James"), or co-founded with his brother, the plaintiff, Vincent Macri ("Vincent"). Since at least 1990, however, Vincent and James equally owned and operated NTD, serving as officers and directors. At that time, both James and Vincent were New York residents with homes in Oyster Bay.

NTD engaged in the research and development of technologies for prenatal screening tests for Down Syndrome and other chromosomal abnormalities. The screening test method developed by NTD is known as the "Free Beta" method. NTD consequently developed computer apparatus and software technology for implementing Free Beta tests. The software used for the Free Beta tests is known as "ScreenLab." James, who has a doctorate in medical sciences, is the inventor, and patents in his name have been obtained or are pending on several NTD innovations.

Because of their inability to continue working together, Vincent entered into a written agreement with James in May of

---

[1] For the purposes of this motion only, the facts are taken from the plaintiffs' complaint and the affidavits and supporting materials submitted by the parties.

1993 to transfer his 50% of the NTD shares to James, giving him 100% ownership of NTD ("Master Agreement"). In exchange, Vincent received 100% ownership of Equichem Research Institute, Ltd. ("Equichem NY"), which had been a wholly-owned subsidiary of NTD, incorporated in New York. Under the terms of the Master Agreement, Equichem NY would receive an exclusive royalty-free license to sublicense, sell, or otherwise exploit ScreenLab. In turn, Equichem NY issued to NTD a royalty-free right to use ScreenLab internally. The Master Agreement provided that Vincent would have the same right as NTD and/or James in the Free Beta technology, and that James and NTD would render reasonable assistance to Vincent and Equichem NY in obtaining patents for ScreenLab. The Master Agreement further provided for bimonthly payments to Vincent, commencing in June of 1993 and continuing until May of 2003, with a decrease in the amount of the payments taking effect after the first three years.

In June of 1993, the brothers executed five related agreements to implement the Master Agreement. James executed a Quitclaim Assignment that transferred to Equichem NY the entire right, title and interest in the ScreenLab software and Down's syndrome detection program developed by NTD as well as all rights in American and European patents and patent applications for ScreenLab technology. The parties entered into a License

3

Agreement that granted NTD and James a non-exclusive royalty-free license to use, copy, reproduce, modify, improve, and enhance the software assigned to Equichem NY. The License Agreement expressly prohibits James and NTD from selling, licensing or sublicensing, or otherwise exploiting the software. The Other Products Agreement ("Products Agreement") grants to Equichem NY a non-exclusive license to sublicense, sell, and otherwise exploit other NTD technology products.[2] Another agreement ("Free Beta Agreement") provides that Vincent shall have the same legal and equitable rights to use Free Beta Technology as James and NTD, even though James is the developer and patent holder for the technology. The Free Beta Agreement authorizes James to license Free Beta technology to Eastman Kodak, with one-half of any licensing payments to be paid to Vincent directly. Both James and Vincent agreed to be bound by any such licensing agreement. An additional agreement ("Consulting Agreement") provides that Vincent will be available to NTD for consulting to the extent his services do not impede his performance with Equichem NY. The

---

[2] The Products Agreement refers to specific technology listed in "schedule 1" annexed to the agreement. The court did not find "schedule 1" among the materials submitted by the plaintiffs. The terms of the Products Agreement provide that NTD will make periodic payments to Equichem NY towards the marketing, research and commercialization of the schedule 1 products, and Equichem NY will pay royalties to NTD for licensing fees received from the schedule 1 products.

4

Consulting Agreement reiterates the compensation terms of the Master Agreement, which states that Vincent will be paid $13,104 per month, for thirty-five months and $11,021 per month, for the next eighty-four months, on a bimonthly basis.

The Master Agreement and related agreements were fully negotiated and executed in the state of New York in May and June of 1993. Only the Consulting Agreement, License Agreement, and Products Agreement contain choice-of-law clauses, which state that the agreements are to be governed by the laws of New York. None of the agreements contains a forum selection clause.

At the time of the parties' agreements, NTD had been negotiating with Eastman Kodak to license Free Beta technology and ScreenLab software. In March of 1994, Kodak was granted an exclusive license by NTD for Free Beta and a non-exclusive license by Equichem NY for the use of ScreenLab. Kodak subsequently sold its clinical laboratory business to Johnson & Johnson, which assumed the licenses for Free Beta and ScreenLab. In 1999, Johnson & Johnson's Free Beta license became non-exclusive.

At some point in 1994, Vincent and his family moved to New Hampshire. In 1995, Equichem Research Institute, Ltd. was

incorporated by Vincent in New Hampshire ("Equichem NH").[3]  The plaintiffs characterize Equichem NH as the "successor" company to Equichem NY.  Although the defendants now dispute that designation, the parties continued their business relationship with James and NTD operating in New York, and Vincent and Equichem NH operating in New Hampshire.

In April of 1996, James wrote Vincent to suggest changes to the Consulting Agreement, for unspecified reasons.  Within a week, Vincent responded to James's proposals with a signed agreement amending the Master Agreement and the Consulting Agreement ("1996 Amendment").  The 1996 Amendment states that Vincent's salary will remain at its current level, instead of decreasing after three years pursuant to the Consulting Agreement, and it extends his salary payments to August of 1994, over one year beyond the time frame established in the Master and Consulting Agreements.  The 1996 Amendment also provides that James and Vincent agree to meet twice monthly in Boston or another mutually convenient location, and that NTD will pay Vincent an annual retirement benefit to be determined by James, as well as $700 per month for health insurance, until 2004.  James signed the agreement in New York.

---

[3] According to the defendants, Equichem NY was not dissolved until 1998.

Vincent alleges that at some time following the Kodak licensing agreements in March of 1994, James and NTD began marketing Free Beta technology "packaged" with interrelated ScreenLab software, without notifying and paying royalties to Equichem NH, in violation of Equichem NH's exclusive license pursuant to the Master Agreement, Quitclaim Assignment, and License Agreement. In addition, Vincent alleges that in April and October of 2001, James and NTD "attacked" Equichem NH's European patent rights for ScreenLab and attempted to have the European Patent Office nullify its patent rights, in violation of their obligations under the Master Agreement. Vincent also alleges that starting in July of 2001, NTD and James failed to make the payments required by the parties' agreements, and they have not made any payments since that time.[4]

On July 13, 2001, James wrote to Vincent in New Hampshire, stating that Vincent had breached and continued to breach the Master Agreement since January of 2000. James asserted that Vincent's breaches relieved NTD and James of any further

_____

[4] The plaintiffs allege that the defendants failed to make the required payments starting July 1, but the defendants submit a cancelled check dated June 29, 2001, issued to Vincent to satisfy the July 1 payment. At any rate, there is no dispute that no further payments were made after that check. That dispute is not material for the purpose of this jurisdictional analysis.

obligations and duties to Equichem NH or Vincent.

The plaintiffs allege that Equichem NH has registered ScreenLab, an original work of art, with the United States Copyright Office.  The plaintiffs state in their complaint that a copy of the registration is attached as "Exhibit D."  Exhibit D appears to be an application for copyright registration, submitted to the United States Register of Copyright by Equichem Research Institute, Ltd., dated November 9, 2001.

On December 12, 2001, the plaintiffs sent the defendants a notice to cure their default on the payments, pursuant to the terms of the Master Agreement.  On December 13, 2001, the plaintiffs filed this diversity action against the defendants.

## Discussion

The defendants, James and NTD, move to dismiss the plaintiffs' action on the ground that this court lacks personal jurisdiction over the defendants.  See Fed. R. Civ. P. 12(b)(2). The defendants also move, in the alternative, to dismiss the action on the ground that the plaintiffs fail to state claims upon which relief may be granted.  See Fed. R. Civ. P. 12(b)(6). The defendants argue that if the action is not dismissed, it should be transferred to the Eastern District of New York under the doctrine of forum non conveniens.  See 28 U.S.C. § 1404(a). The plaintiffs object.

8

I.    Personal Jurisdiction

The defendants contend that they are not subject to personal jurisdiction in New Hampshire because they lack minimum contacts with this forum.  They argue that they are New York residents, NTD is incorporated in New York and its principal place of business is in New York, neither NTD nor James is licensed to do business or has done business in New Hampshire, and none of the actions alleged by the plaintiffs took place in New Hampshire.

On a motion to dismiss for lack of personal jurisdiction, "the plaintiff ultimately bears the burden of persuading the court that jurisdiction exists."  Massachusetts Sch. of Law at Andover v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998); Sawtelle v. Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995).  Where, as here, no evidentiary hearing is held, the plaintiffs need only make a prima facie showing of personal jurisdiction.  See Nowak v. Tak How Investments, Ltd., 94 F.3d 708, 712 (1st Cir. 1996) (noting that a full-blown evidentiary hearing is not necessary where the facts are essentially undisputed); Sawtelle, 70 F.3d at 1385-86.  Under the prima facie standard, the court considers properly documented facts alleged in the pleadings and in the parties' supplemental filings, including affidavits.  See Sawtelle, 70 F.3d at 1385; Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 145 (1st Cir. 1995).  The facts alleged by the plaintiff are taken as true and construed in the

9

light most favorable to the plaintiff's jurisdictional assertion. See Mass. Sch. of Law, 142 F.3d at 34. Facts affirmed by the defendants are considered to the extent that they are undisputed. See id.

When subject matter jurisdiction is premised on diversity, a federal court may assert personal jurisdiction over a nonresident if the plaintiff establishes "sufficient contacts between the defendant and the forum to satisfy both the state's long-arm statute and the Fourteenth Amendment Due Process clause." Sawtelle, 70 F.3d at 1387. New Hampshire's long-arm statute, Revised Statutes Annotated § ("RSA") 510:4, I, has been interpreted to authorize jurisdiction coextensive with the federal due process standard. See Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 287 (1st Cir. 1999). The court therefore needs only to determine whether applying personal jurisdiction to the defendants would comply with the requirements of Fourteenth Amendment due process. See id.; Mass. Sch. of Law, 142 F.3d at 35. The constitutional touchstone for personal jurisdiction is minimum contacts. See United. Elec., Radio and Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1087 (1st Cir. 1992). "The minimum contacts standard requires that a court asserting personal jurisdiction determine that the nonresident defendant possesses sufficient contacts with the forum state so that subjecting [him] to it does not offend

10

'traditional notions of fair play and substantial justice.'"
Id., quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316
(1945).

The minimum contacts required depend on whether the
plaintiff is asserting jurisdiction under a theory of "general"
or "specific" jurisdiction.  See Sawtelle, 70 F.3d at 1387 n.3.
A defendant who has maintained continuous and systematic contacts
with the forum state is subject to general jurisdiction in that
forum with respect to all causes of action, even those unrelated
to the defendants' forum-based activities.  See Phillips Exeter
Acad., 196 F.3d at 288; Remsberg v. Docusearch, Inc., No. 00-211-
B, 2002 WL 130952, at *3 (D.N.H. Jan. 31, 2002).  Where a
defendant does not have continuous and systematic contacts
sufficient to establish general jurisdiction, a court may
exercise specific jurisdiction over a defendant if the cause of
action arises from, or relates to, the defendant's contacts with
the forum.  See Phillips Exeter Acad., 196 F.3d at 288; The
Mountain Corp. v. Noles, No. 01-207-B, 2002 WL 24310, at *3
(D.N.H. Jan. 9, 2002).  Although they do not label it as such,
the plaintiffs assert specific jurisdiction over the defendants
in this case.

The First Circuit applies a three-part analysis to determine
whether exercising specific jurisdiction would comport with due
process requirements.  See Phillips Exeter Acad., 196 F.3d at

11

288.  First, under the "relatedness" prong, the court must ask whether the claim that undergirds the litigation directly relates to or arises out of the defendant's contacts with the forum.  Id.  Second, the court must ask whether those contacts constitute purposeful availment of the benefits and protections afforded by the forum's laws.  Id.  Third, the court must analyze the overall reasonableness of an exercise of jurisdiction, taking into account a number of "Gestalt factors" that relate to the fundamental fairness of exercising jurisdiction.  Id.; United Elec. Workers, 960 F.2d at 1088.

"Questions of specific jurisdiction are always tied to the particular claims asserted."  Phillips Exeter Acad., 196 F.3d at 289.  Here, the plaintiffs allege multiple causes of action based on theories of tort, contract, and copyright infringement.  Because each type of claim requires a different analysis, the court will apply the tripartite test to the plaintiffs' contract, tort, and copyright claims separately.  See Phillips Exeter Acad., 196 F.3d at 289; Mass. Sch. of Law, 142 F.3d at 35; Anderson v. Century Prod. Co., 943. F. Supp. 137, 141, 143-44 (D.N.H. 1996).

A.    Breach of Contract Claims

The plaintiffs allege breach of contract on separate grounds in counts V-VIII.  In count V, the plaintiffs allege that the

defendants breached the Master Agreement and Consulting Agreement by failing to make salary payments to Vincent and failing to make payments to Equichem. In counts VI and VII, the plaintiffs allege that the defendants breached the Master Agreement, the Quitclaim Assignment, the Free Beta Agreement, and the License Agreement, by offering to provide ScreenLab software packaged with Free Beta rights, and by interfering with the plaintiffs' rights to obtain patents.[5] In count VIII, the plaintiffs allege that the defendants are about to or have already licensed ScreenLab along with the Free Beta method, without the plaintiffs' authorization, for their commercial and/or financial gain, in breach of the Master Agreement, Quitclaim Assignment and License Agreement.

1.    Relatedness

"[T]he relatedness requirement focuses on the nexus between the defendant's contact and the plaintiff's cause of action." Ticketmaster-New York v. Alioto, 26 F.3d 201, 206 (1st Cir.

---

[5] In count VI the plaintiffs seek injunctive relief, and in count VII they seek damages. In these counts the plaintiffs state that the "defendants . . . interfer[ed] with defendants' right to obtain patents for the software." It appears that the plaintiffs inadvertently used the word "defendants'" instead of "plaintiffs'" in these two allegations. The court will proceed on the assumption that the plaintiffs intended to allege that the defendants interfered with the plaintiffs' right.

13

1994).  In a contract case, relatedness is established if the defendants' contacts with the forum "were instrumental either in the formation of the contract or in its breach."  Phillips Exeter Acad., 196 F.3d at 289; United Elec. Workers, 960 F.2d at 1089. The defendant's in-state contacts must constitute at least a material element of proof for the plaintiff's claim.  See United Elec. Workers, 960 F.2d at 1089.  The mere existence of a contractual relationship between a nonresident defendant and a plaintiff is insufficient to establish relatedness in the plaintiff's forum.  See Phillips Exeter Acad., 196 F.3d at 290. While communications such as letters and faxes sent into the forum are contacts, they are meaningful in the jurisdictional analysis only if they give rise to the plaintiff's cause of action.  See Sawtelle, 70 F.3d at 1389-90; Int'l Paper Box Mach. Co., Inc. v. Paperboard U.S. Indus., Inc., et al., No. 99-184-JD, 2000 WL 1480462, at *4 ("IPBM").

In arguing for personal jurisdiction over their contract claims, the plaintiffs do not dispute that the 1993 agreements were initially formed in New York.[6]  They contend, however, that

---

[6] As previously noted, the Master Agreement and the Consulting Agreement were amended in 1996 when James sent Vincent a letter proposing amendments and Vincent responded by drafting and signing a modification to the agreements, the 1996 Amendment, and returning it to James in New York.  The 1996 Amendment, therefore, occurred in part in New Hampshire.

14

the defendants' communications sent to them in New Hampshire are sufficient contacts to meet the relatedness prong for their breach claims.

In count V the plaintiffs allege a breach of contract claim based on the defendants' failure to make payments to Vincent and Equichem NH required under the parties' agreements. Vincent affirms that the defendants made payments to him and Equichem NH in New Hampshire and that their failure to continue doing so constitutes in-forum contacts giving rise to the breach claimed in count V. Vincent also argues that the July 13, 2001 letter sent by James to the plaintiffs in New Hampshire effectively repudiated the parties' agreements, and is an in-forum contact that gives rise to the breach claim. James states in the letter that he and NTD were relieved of their obligations under the agreements and would not continue performing under them. Those agreements establish the defendants' obligation to make the payments at issue in the breach claim.

The defendants' failure to pay the plaintiffs in New Hampshire under the terms of the Master Agreement and Consulting Agreement by itself is not enough to satisfy the relatedness requirement. See Phillips Exeter Acad., 196 F.3d at 291. However, the July 13 letter may be construed as a repudiation of the parties' agreements, and as such it is material to the breaches of the Master Agreement and Consulting Agreement alleged

15

by the plaintiffs in count V. In addition, the 1996 Amendment occurred partially in New Hampshire, and it modified the terms of the defendants' obligation to make payments to Vincent. Therefore, the 1996 Amendment constitutes an in-forum contact that is material to the plaintiffs' breach claim. Taken together, the July 13 letter, the 1996 Amendment, and the defendants' failure to make the payments to the plaintiffs in New Hampshire as required by the agreements, are sufficiently related to the plaintiffs' breach of contract claim in count V to support personal jurisdiction.

In counts VI and VII, the plaintiffs allege that the defendants offered to license ScreenLab without authority, and interfered with Equichem NH's patent rights. James's July 13 letter announcing that the defendants would no longer perform under the agreements suffices as an in-forum contact material to the breach claims regarding the licensing rights established in those agreements. In addition, Vincent affirms that the defendants communicated with the plaintiffs in New Hampshire by mail, fax, telephone and courier service. He states that through these contacts, James announced his and NTD's breaches by sending drafts of unilaterally negotiated licenses for ScreenLab packaged with Free Beta, and soliciting Vincent's authority for the defendants to proceed unilaterally. Although the substance of those contacts is not supported by documentation, the defendants

16

do not dispute Vincent's description.  When considered together with the July 13 letter, the defendants' in-forum communications give rise to the plaintiffs' count VI and VII breach claims, to the extent that they involve licensing rights.

In counts VI and VII, the plaintiffs also allege that the defendants interfered with their interests in ScreenLab's European patent.  The defendants' obligation to "render reasonable assistance" to the plaintiffs in obtaining ScreenLab patents was established in the Master Agreement.  As discussed above, the July 13 letter is an in-forum contact material to the plaintiffs' claim that the defendants breached the Master Agreement.  To the extent that the defendants' interference with the patent process breached a duty that was established in the Master Agreement, the July 13 letter ending the defendants' performance under the Master Agreement is material to that breach.  Considering the facts in the light most favorable to Vincent and Equichem NH, the defendants' contacts in New Hampshire are sufficiently related to the plaintiffs' claims of breach in counts VI and VII to support personal jurisdiction.

In count VIII, the plaintiffs allege that the defendants are about to or have entered into licenses for ScreenLab along with the Free Beta method, for their financial and/or commercial gain.  For the reasons set forth above, the defendants' July 13 letter and communications to Vincent in New Hampshire constitute

17

in-forum contacts material to the plaintiffs' claims of breach regarding licensing rights, and therefore are sufficiently related to the breach claim in count VIII to support personal jurisdiction.

2. Purposeful Availment

"The purposeful availment test requires us to consider whether the [defendants'] contacts with New Hampshire 'represent a purposeful availment of the privilege of conducting activities in [New Hampshire], thereby invoking the benefits and protections of [its] laws and making the defendant[s'] involuntary presence before the state's courts foreseeable.'" Phillips Exeter Acad., 196 F.3d at 292, quoting United Elec. Workers, 960 F.2d at 1089. "The function of the purposeful availment requirement is to assure that personal jurisdiction is not premised solely upon a defendant's 'isolated, random or fortuitous' contacts with the forum state." Sawtelle, 70 F.3d at 1391, quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984). The two focal points for an analysis of purposeful availment are whether the defendants' contacts in the forum were voluntary and foreseeable. See Nowak, 94 F.3d at 716.

18

a.    Voluntariness

"The defendant's contacts with the forum state must be voluntary-that is, not based on the unilateral actions of a party or a third person." Nowak, 94 F.3d at 716; see also Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 416-17 (1984) (holding that location of bank on which a party chooses to draw checks for payment is unilateral decision inappropriate for consideration for jurisdictional purposes). "'[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state.'" Burger King, 471 U.S. at 475, quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958); Nowak, 94 F.3d at 716-17. Contacts are not voluntary if the plaintiffs draw the defendants into continuing business with them through coercion or deception. See Remsberg, 2002 WL 130952, at *5.

Here, the defendants entered the Master Agreement and its corollary agreements with the plaintiffs in New York, while all parties involved were New York residents and corporations. The defendants argue that since they did not reach into New Hampshire to form the agreements, Vincent's decision to move to New Hampshire and incorporate Equichem there was a unilateral activity that renders their contacts in this forum involuntary. The defendants point out that nothing in the negotiation, formation or terms of the agreements indicates that the

19

defendants intended to avail themselves of the laws or privileges in New Hampshire.

For seven years following Vincent's move and six years following Equichem's reincorporation, however, the defendants continued to deal with the plaintiffs in New Hampshire. James sent his proposals for the 1996 Amendment to Vincent in New Hampshire, and Vincent drafted and executed the amendment in New Hampshire. Taking the plaintiffs' asserted facts as true, it appears that during their business relationship the defendants derived a benefit from the performance of Vincent and Equichem NH pursuant to the agreements. Although NTD and James may not have had a say in the plaintiffs' decision to relocate, the defendants' continued dealings with the plaintiffs show voluntary contacts with New Hampshire.

### b. Foreseeability

In addition to being voluntary, the defendants' contacts with the forum state must be foreseeable, "such that [they] should reasonably anticipate being haled into court there." Nowak, 94 F.3d at 716. "The enforcement of personal jurisdiction over a non-resident defendant is foreseeable when that defendant has established a continuing obligation between itself and the forum state." Sawtelle, 70 F.3d at 1393; see also Burger King, 471 U.S. at 476 (finding that defendant had entered a twenty-year

20

relationship that envisioned continuing contacts with forum state).  While the mere existence of an agreement between the parties is insufficient to show foreseeability, additional factors such as the parties' course of dealing, the benefit to the defendant, the terms of the agreement, prior negotiations, and expected future consequences of the agreement pertain to the foreseeability of jurisdiction in the forum.  See Phillips Exeter Acad., 196 F.3d at 292; U.S.S. Yachts, Inc. v. Ocean Yachts, Inc., 894 F.2d 9, 12 (1st Cir. 1990).

Here, the Consulting Agreement anticipated a ten-year relationship between the parties, which suggests that the defendants could foresee a long-term relationship with Vincent. The 1996 Amendment, formed with the plaintiffs when they were located in New Hampshire, extended the duration of that relationship.  None of the agreements contain provisions restricting performance to New York, or forum selection clauses.[7] Taking the supported allegations of the plaintiff as true, the defendants received commercial benefit from continuing their relationship with the plaintiffs, including a royalty-free license to use ScreenLab and the consulting services of Vincent. Furthermore, the parties' course of dealing shows that the

_____

[7] Three of the agreements contained choice of law clauses indicating that New York law should govern the agreements.

21

defendants conducted business with the plaintiffs after their move to New Hampshire, by negotiating the 1996 Amendment and continuing to make periodic payments to Vincent and Equichem NH pursuant to their agreements.[8]

The defendants' long-term relationship, expected commercial benefits, and negotiations with the plaintiffs, in addition to their agreements, show that the defendants had continuing obligations with the plaintiffs in New Hampshire. Based on their ongoing business relationship with the plaintiffs after they relocated to New Hampshire, the defendants could reasonably foresee the possibility of being haled into court in New Hampshire.

### 3. Gestalt Factors

The third prong of the specific jurisdiction analysis focuses on whether exercising jurisdiction would be consistent with traditional notions of "fair play and substantial justice." Int'l Shoe Co., 326 U.S. at 320; see also Nowak, 94 F.3d at 717. In making this determination of fairness, there are five factors that must be considered: "(1) the defendants' burden of

_____

[8] The defendants argue that they were unaware that Equichem NY had become a New Hampshire corporation. However, their course of dealing indicates that the defendants knew Equichem was located in New Hampshire.

appearing; (2) the forum state's interest in ajudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies." Sawtelle, 70 F.3d at 1394. "[T]he reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction." Ticketmaster, 26 F.3d at 210.

The plaintiffs argue that the Gestalt factors weigh in favor of asserting jurisdiction. The defendants do not make specific arguments regarding the Gestalt factors, aside from James's affirmation that his absence from NTD to litigate the claims in New Hampshire would be disruptive to NTD's business. The relatedness and purposeful availment showings in this case are sufficient to establish personal jurisdiction in the absence of any showing by the defendants that exercising jurisdiction would be unreasonable. See Nowak, 94 F.3d at 719. Therefore, the court concludes that exercising jurisdiction over the contract claims in New Hampshire is reasonable and comports with the standards of fair play and substantial justice.

23

B.    Tort Claims

In counts I-IV the plaintiffs bring four tort claims based on three causes of action.  In count I, misappropriation, the plaintiffs allege that "defendants have misappropriated plaintiffs' rights in the ScreenLab software."  In count II, unfair competition, they allege that "defendants' interference with plaintiffs' European patent registration and plaintiffs' ability to exploit its ScreenLab software constitutes unfair competition."  In count III, unjust enrichment, the plaintiffs allege that "[a]s set forth above, defendants have taken for themselves plaintiffs' interests in the ScreenLab software and have been unjustly enriched thereby."  In count IV, the plaintiffs seek a constructive trust to remedy the injury caused by the torts.

The relatedness requirement for tort claims is satisfied where the in-forum contacts are both the cause in fact and the proximate cause of the plaintiff's injuries.  See Burger King, 471 U.S. at 474; Mass. Sch. of Law, 142 F.3d at 35; The Mountain Corp., 2002 WL 24310, at *3.  A defendants' in-forum contacts are the cause in fact of the claim if "'the injury would not have occurred 'but for' the defendant's forum state activity.'"  Mass. Sch. of Law, 142 F.3d at 35, quoting United Elec. Workers, 960 F.2d at 1089; see also Phillips Exeter Acad., 196 F.3d at 291 (holding that defendant's breach of fiduciary duty outside the

24

forum was inadequate to support finding of relatedness); Remsberg, 2002 WL 130952, at *4 (finding that defendant's contacts with forum state were causes in fact for deceased's death because information transmitted was necessary for killer to complete his plan).  The proximate cause requirement is met where the defendants' contacts serve to make the resulting injury foreseeable to the defendants.  See Nowak, 94 F.3d at 715; Remsberg, 2002 WL 130952, at *4 (finding that defendant was aware that information transmitted could be misused to harm deceased). The effects of a tort felt in a forum are not equivalent to an actual injury caused in the forum by in-forum activities.  See U.S. v. Swiss Am. Bank, Ltd., 274 F.3d 610, 625 (1st Cir. 2001), citing Kowalski v. Doherty, Wallace, Pillsbury & Murphy, 787 F.2d 7, 11 (1st Cir. 1988); Phillips Exeter Acad., 196 F.3d at 291.

The plaintiffs bear the burden of establishing that the defendants' in-forum contacts are the actual and legal causes of the claims asserted.  See Mass Sch. of Law, 142 F.3d at 34-35. The court bases its analysis on the plaintiffs' supported pleadings.  In this case, the plaintiffs' allegations and memorandum are conclusory and do not show that the defendants' contacts give rise to the tortious activities alleged.

Vincent affirms that the defendants have "made clear to him" their intentions to market and possibly license ScreenLab in violation of the parties' agreements, but he does not suggest

25

that those activities have occurred in New Hampshire. The record before the court does not establish the defendants' contacts with New Hampshire as a cause in fact or legal cause of the plaintiffs' claims. The court therefore does not have sufficient information to determine whether the defendants had contacts related to the claims alleged sufficient to meet the requirements necessary to assert personal jurisdiction. The plaintiffs fail to meet their burden of showing that the court may exercise personal jurisdiction over the defendants as to the plaintiffs' tort claims, in counts I-IV.

C.    Federal Copyright Claims

Equichem NH brings two copyright infringement claims pursuant to 17 U.S.C. § 101 et seq. In counts IX and X, it alleges that it has registered a copyright for ScreenLab and that the defendants have violated, or are about to violate, Equichem NH's rights as owner of the copyright.[9]

Section 101 et seq. does not contain a provision for personal jurisdiction or nationwide service of process. See Janmark, Inc. v. Reidy, 132 F.3d 1200, 1201 (7th Cir. 1997); Sabanek Assocs., Inc. v. Navarro, No. 95-269-B, 1995 WL 869382,

_____

[9] The two claims are based on the same cause of action, but count IX seeks equitable relief and count X seeks damages.

26

at *1 (D.N.H. 1995). The court therefore applies the New Hampshire long-arm statute, which is construed as coextensive with due process. See Fed. R. Civ. P. 4(k)(1)(A); Phillips Exeter Acad., 196 F.3d at 287.[10] The due process analysis requires the court to apply the tripartite test, to determine whether the defendants have in-forum contacts sufficient to establish specific jurisdiction. See Sabanek Assocs., 1995 WL 869382, at *3-4.

To meet the first prong of the test, Equichem NH must show that its infringement claims directly relate to or arise from the defendants' contacts in New Hampshire. Equichem NH claims that the defendants' actions have infringed, or are about to infringe, its rights to the ScreenLab software. To prevail on a claim of copyright infringement, a plaintiff must show ownership of a valid copyright and illicit copying. See Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC, 259 F.3d 25, 33 (1st Cir. 2001). Equichem NH has not shown that any of the defendants' in-forum contacts are material to either ownership of the copyright or illicit copying. To the extent that Equichem NH has ownership rights to the ScreenLab software, the rights were created by assignments that were part of the agreements executed in New

---

[10] Rule 4(k)(1)(A) extends personal jurisdiction over a party served who would be subject to the jurisdiction of a court in the state where the district court is located.

27

York.  Equichem NH does not allege that the defendants illicitly copied the SreenLab software in New Hampshire, or that they attempted to market the software in New Hampshire.  Equichem NH fails to meet its burden of showing that the defendants' in-forum contacts gave rise to its federal copyright claims.

D.    Inconsistent Personal Jurisdiction

"It is basic law that a court must have personal jurisdiction over the parties to hear a case, that is, the power to require the parties to obey its decrees."  Swiss Am. Bank, 247 F.3d at 617 (quotation omitted).  Furthermore, personal jurisdiction must be established for each of the causes of action in a complaint.  See Phillips Exeter Acad., 196 F.3d at 289; Anderson, 943 F. Supp. at 141.  "There must be an independent basis for the assertion of personal jurisdiction for each claim.  Jurisdiction over one claim does not imply jurisdiction over another."  Debrenci v. Bru-Jell Leasing Corp., 710 F. Supp. 15, 19 (D. Mass. 1989), quoted in Anderson, 943 F. Supp. at 141.

Where, as here, due process only allows the court to assert personal jurisdiction over the defendants for some of the claims asserted by the plaintiffs, the court may not exercise jurisdiction over the remaining claims.  The plaintiffs' tort and federal copyright claims are dismissed for lack of personal

28

jurisdiction, without prejudice to the plaintiffs' rights to refile the claims in any district where the defendants may be subject to personal jurisdiction. See Phillips Exeter Acad., 196 F.3d at 292 n.4; IPBM, 2000 WL 1480462, at *6.


II. Transfer of Venue

The defendants move to transfer this action to the Eastern District of New York on the ground of forum non conveniens, pursuant to 28 U.S.C. § 1404(a). Section 1404(a) states: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."[11] The defendants argue that the overwhelming weight of relevant contacts is in New York, where the agreements at issue were negotiated and where the substantive acts relevant to the causes of action occurred, if at all. In the First Circuit, a court may not grant a transfer under § 1404(a) if it does not have personal jurisdiction over the defendant. See Albion, 171 F.3d at 2. The court will therefore consider the defendants' motion to transfer only as it relates to the plaintiffs' breach of

---

[11] Section 1404(a) is a codification of the doctrine of forum non conveniens, which the defendants invoke in their motion to transfer. See Albion v. YMCA Camp Letts, 171 F.3d 1, 2 (1st Cir. 1999).

contract claims, namely, counts V, VI, VII, and VIII.

The court evaluates motions to transfer according to "individualized, case-by-case consideration of convenience and fairness. A motion to transfer under § 1404(a) thus calls on the district court to weigh in the balance a number of factors." Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988) (quotation omitted). Factors of convenience to be considered by the court include:

> (1) the convenience of the parties; (2) the
> convenience of the witnesses; (3) the relative ease
> of access to sources of proof; (4) the availability
> of process; (5) [the] cost of obtaining willing
> witnesses; and (6) trying the case most expeditiously
> and inexpensively.

F.A.I. Electronics v. Chambers, 944 F. Supp. 77, 80-81 (D. Mass. 1996).

Factors of public interest are also considered. See Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09 (1947). The defendants bear the burden of demonstrating that the factors weigh in favor of a transfer. See Buckley v. McGraw-Hill, Inc., 762 F. Supp. 430, 439 (D.N.H. 1991). "'[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'" Id., quoting Gulf Oil, 330 U.S. at 508. The plaintiff's choice of forum is accorded less weight where "the operative facts of [the] case have no material connection with [the] district." McFarland v. Yegen, 699 F.

30

Supp. 10, 15-16 (D.N.H. 1988).  The decision to transfer venue is a matter entirely within the district court's discretion. See Galonis v. Nat'l Broad. Co., 498 F. Supp. 789, 792 (D.N.H. 1980).

In this case, the parties do not dispute that this action "might have been brought" in the Eastern District of New York. See § 1404(a).[12]  The defendants, who reside in New York, would find it more convenient to litigate there, and they argue that their witnesses, all located in New York, would find it more convenient as well.  The plaintiffs point out that the defendants' witnesses are largely employees who may be compelled to appear in New Hampshire.  In contrast, the plaintiffs, who reside in New Hampshire, would prefer to litigate here, although they do not assert that they have witnesses located in New Hampshire.  The defendants argue that their books are located in New York, while the plaintiffs argue their books are in New Hampshire.

The court concludes that the defendants did not meet their burden of showing that the factors, on balance, weigh strongly in favor of a transfer.  See Buckley, 762 F. Supp. at 439.  The defendants' motion to transfer venue to the Eastern District of

---

[12] In this motion, the defendants do not challenge that venue is proper in the District of New Hampshire.

31

New York is denied.  However, the court reserves to the defendants the right to file another motion for transfer of venue, in the event the plaintiffs commence an action in New York involving the claims set forth in counts I-IV, IX, and X.


III. Motion to Dismiss

The defendants move to dismiss the plaintiffs' action for failure to state a claim for which relief may be granted.  See Fed. R. Civ. P. 12(b)(6).  When considering a motion to dismiss pursuant to Rule 12(b)(6), the court takes all well-pleaded facts in the complaint as true and draws all reasonable inferences in the plaintiff's favor.  See Mass. Sch. of Law, 142 F.3d at 40.  A plaintiff's claim should not be dismissed "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  Judge v. City of Lowell, 160 F.3d 67, 72 (1st Cir. 1998), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  However, the court does not credit legal conclusions or "'subjective characterizations or conclusory descriptions of a general scenario which could be dominated by unpleaded facts.'"  Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995), quoting Coyne v. City of Somerville, 972 F.2d 440, 444 (1st Cir. 1992).  To avoid dismissal, the plaintiff must allege facts as to each element of an actionable legal theory.  See Berner v.

32

<u>Delahanty</u>, 129 F.3d 20, 25 (1st Cir. 1997).

The plaintiffs' claims over which this court has jurisdiction allege breach of contract. "Under New York law, an action for breach of contract requires: (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.'" <u>First Investors Corp. v. Liberty Mut. Ins. Co.</u>, 152 F.3d 162, 168 (2d Cir. 1998), <u>quoting</u> <u>Rexnord Holdings, Inc. v. Bidermann</u>, 21 F.3d 522, 525 (2d Cir. 1994).[13]


A.    <u>Count V: Defendants' Failure to Make Payments</u>

Count V alleges that the defendants breached the Master Agreement and Consulting Agreement by failing to make payments to Equichem NH and Vincent. The defendants assert that the plaintiffs filed suit without first allowing the defendants fourteen days to cure the defaulted payments, a condition precedent to commencing suit as provided in the Master Agreement. The defendants seek dismissal of count V, on the ground that it is premature and deficient on its face, without prejudice to renew following service of a new notice to cure and the expiration, if any, of the cure period. The plaintiffs

---

[13] Since neither party addresses choice of law, and both refer to New York law in their memoranda, the court will apply New York substantive law.

33

allege that the defendants repudiated the Master Agreement, and that all conditions precedent were waived by that repudiation.

The renunciation of contractual obligations gives rise to an immediate cause of action by the other party. Stadtmauer v. Brel Assocs. IV, L.P., 704 N.Y.S.2d 237, 239 (2000). "Where it becomes clear that one party will not live up to a contract, the aggrieved party is relieved from the performance of futile acts or conditions precedent." Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc., 522 N.Y.S.2d 292, 293 (1987). "However, a contract that is not treated as broken continues to exist for the benefit of both parties. There is no specific time limit within which the non-repudiating party must elect his remedy . . . ." Silver Air v. Aeronautic Dev. Corp., Ltd., 656 F. Supp. 170, 178 (S.D.N.Y. 1987).

The plaintiffs allege that the defendants failed to make the periodic payments to Equichem NH and Vincent due under the Consulting Agreement, as amended, in July of 2001, and that they have failed to pay any subsequent installments. The plaintiffs also allege that the defendants have, by their acts and words, repudiated the Master Agreement, which contains the notice requirement. The plaintiffs sent the defendants a notice to cure on December 12, 2001, and filed this action on December 13. Although the plaintiffs sent the notice "in accordance with the Master Agreement," that alone, taking the facts in the light

34

most favorable to the plaintiffs, does not necessarily establish continued operation under the agreement sufficient to overcome the plaintiffs' allegation of repudiation. Therefore, the plaintiffs have stated a claim for breach of the Master Agreement and Consulting Agreement, as amended, and the defendants' motion to dismiss count V is denied.

B.   Counts VI and VII: Offering ScreenLab Licenses without Authorization, and Interfering with Patents

In counts VI and VII the plaintiffs allege that the defendants breached the Master Agreement, Quitclaim Assignment, Free Beta Agreement, and License Agreement, by offering to license ScreenLab along with the Free Beta method, and by interfering with the plaintiffs' right to obtain patents for ScreenLab.[14]

The defendants argue that Vincent does not have standing to bring claims based on the ScreenLab licensing provisions contained in the parties' agreements. The defendants also argue that the plaintiffs fail to state claims because they do not allege that the defendants actually took something that belonged to the plaintiffs, or that the plaintiffs suffered an injury as a result of the defendants' actions. Furthermore, the

---

[14] Count VI seeks injunctive relief and count VII seeks damages.

defendants argue that the plaintiffs' claim that the defendants interfered with the plaintiffs' rights to obtain patents is conclusory.

### 1. Standing

The defendants challenge Vincent's standing to bring the breach of contract claims in counts VI and VII, that are based on the assigned rights to license ScreenLab.[15] The defendants assert that Equichem NH, not Vincent, holds all rights to license ScreenLab, and that Vincent's status as sole shareholder of Equichem NH is insufficient to confer standing on him, personally, for the breach actions. The plaintiffs do not respond to the defendants' argument.

> [T]he general rule, applicable in New York and elsewhere, [is] that where an injury is suffered by a corporation and the shareholders suffer solely through depreciation in the value of their stock, only the corporation itself, its receiver, . . . or a stockholder suing derivatively in the name of the corporation may sustain an action against the wrongdoer.

Vincel v. White Motor Corp., 521 F.2d 1113, 1118 (2nd Cir. 1975). The plaintiffs do not allege that any of the parties' agreements assigned ScreenLab licensing rights to Vincent

---

[15] The plaintiffs' breach claim in count VIII is also based on the assigned rights to license ScreenLab, but the defendants did not challenge Vincent's standing to bring that claim in their motion to dismiss.

36

personally, nor do the plaintiffs allege that Vincent has an individual interest in the ScreenLab patents.[16] The court's review of the Master Agreement, attached to the complaint, does not reveal that Vincent has any right in ScreenLab or its patents independent of Equichem NH.[17] Although Vincent is the sole shareholder of Equichem NH, he is not entitled to bring an action in his own name against the defendants for injury to Equichem NH resulting from the defendants' licensing, or attempted licensing, of ScreenLab, or from their interference with ScreenLab patents. See Paul Arpin Van Lines, Inc. v. Universal Transportation Servs., Inc., 988 F.2d 288, 294 (1st Cir. 1993); Vincel, 521 F.2d at 118-19; Uribe et al v. Merch. Bank of N.Y., 657 N.Y.S.2d 613, 129-30 (1997). Vincent's claims in counts VI and VII are dismissed.

---

[16] The plaintiffs allege that Vincent and James share rights in the Free Beta technology patents and licenses, however, in the Master Agreement, Free Beta and ScreenLab are addressed separately.

[17] The Master Agreement (Complaint Ex. A), Consulting Agreement (Complaint Ex. B), and 1996 Amendment (Complaint Ex. C) were attached and incorporated into the plaintiffs' complaint. For this motion, the court considers only those materials.

2.  Equichem's Claims That Defendants Breached Licensing
    Provisions

The defendants move to dismiss Equichem's breach claims in counts VI and VII on the ground that the plaintiffs have not alleged the necessary elements for a breach action.[18]  The plaintiffs allege that the defendants breached the parties' agreements by attempting to license ScreenLab to third parties. The plaintiffs further assert that the defendants acted without notifying plaintiffs that licensees had been identified, that negotiations were underway, and that one or more agreements in principle had been reached with multiple licensees.  The defendants argue that the plaintiffs' allegation that the defendants offered ScreenLab to licensees does not constitute a breach of the agreements, and also that the plaintiffs failed to allege injury caused by the defendants' actions.

The Master Agreement states that Equichem NH holds the exclusive right to "sublicense, sell, or otherwise exploit ScreenLab."  The plaintiffs' allegation that the defendants exploited ScreenLab by marketing it in conjunction with their Free Beta technology, without authorization from Equichem NH, is sufficient to state a claim that the defendants violated

_____

[18] For the purposes of this motion only, the defendants do not dispute that Equichem NH is the successor to Equichem NY and holds the rights to license ScreenLab.

38

Equichem NH's exclusive licensing rights. The plaintiffs allege that they have suffered financial damages as a result of the defendants' breach of contract. The plaintiffs' allegation of damages, together with their allegations of the defendants' breach, is sufficient to satisfy the pleading requirement of a breach of contract claim. The defendants' motion to dismiss Equichem NH's breach claims based on its exclusive licensing rights, alleged in counts VI and VII, is denied.

### 3. Equichem's Claims That Defendants Interfered With Patents

The defendants assert that the plaintiffs fail to allege sufficient facts to support Equichem NH's claims in counts VI and VII that the defendants interfered with its patent rights. The plaintiffs allege that Equichem NH had the rights to secure patents for ScreenLab, and that the defendants were obligated by the Master Agreement to render reasonable assistance in obtaining the patents. The plaintiffs allege that the defendants "attacked" Equichem NH's patent rights by surreptitiously attempting to have their European patent rights nullified.

The plaintiffs allege no facts to support Equichem NH's claim that the defendants breached the Master Agreement by interfering with its patent rights. They do not allege how or

39

by what means the defendants allegedly attempted to interfere, what ScreenLab's European patent status was prior to the interference, whether the defendants' interference was successful, or what injury resulted from the defendants' interference.  The plaintiffs' conclusory allegation of interference with patent rights is insufficient to state Equichem NH's claim for breach of the Master Agreement.  Equichem NH's breach claims based on the defendants' alleged interference with their patent rights, alleged in counts VI and VII, are insufficiently pleaded and fail to state claims for which relief may be granted.  The defendants' motion to dismiss is granted as to the patent interference claims.

Conclusion

For the foregoing reasons, the defendants' motion to dismiss for lack of personal jurisdiction (document no. 8) is granted in part.  The plaintiffs' tort and federal copyright claims, counts I-IV, IX & X, are dismissed for lack of personal jurisdiction.  The defendants' motion is denied as to the plaintiffs' contract claims, counts V-VIII.

The defendants' motion to transfer venue to the Eastern District of New York (document no. 8) is denied.  However the court reserves to the defendants the right to file another motion for transfer of venue in the event the plaintiffs

commence an action in New York involving the claims set forth in counts I-IV, IX, and X.

The defendants' motion to dismiss for failure to state a claim for which relief may be granted (document no. 8) is granted in part. Vincent's claims in counts VI and VII are dismissed for lack of standing, and Equichem NH's claims based on the defendants' alleged interference with its patent rights, in counts VI and VII, are dismissed. The defendants' motion to dismiss is denied as to the plaintiffs' counts V and VIII, and Equichem NH's claims based on its exclusive licensing rights, in counts VI and VII.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

May 1, 2002

cc:  James F. Ogorchock, Esquire
     Martin J. O'Donnell, Esquire
     Thomas J. Fleming, Esquire
     Andrew W. Serell, Esquire

41