**PHILLIPS EXETER ACADEMY,**
**Plaintiff, Appellant,**

v.

**HOWARD PHILLIPS FUND, INC.,**
**et al., Defendants, Appellees.**

No. 99–1254.

United States Court of Appeals,
First Circuit.

Heard Sept. 16, 1999.

Decided Nov. 19, 1999.

---

Harvey J. Wolkoff, with whom John H. Mason, Robert L. Kilroy, Ropes & Gray, Jack B. Middleton, Rachel A. Hampe and McLane, Graf, Raulerson & Middleton were on brief, for appellant.

Richard B. Couser, with whom Roy S. McCandless, Orr & Reno, P.A., Gregory Presnell and Akerman, Senterfit & Edison, P.A. were on brief, for appellees.

Before Selya, Circuit Judge, Coffin, Senior Circuit Judge, and Lipez, Circuit Judge.

SELYA, Circuit Judge.

This appeal presents a jurisdictional tangle. The seeds for the underlying litigation were sown when the late Howard Phillips (Phillips or the testator) bequeathed all the stock in a profitable Florida-based real estate development company, Dr. Phillips, Inc. (the Company), to the Howard Phillips Fund (the Fund), upon the condition that the Fund share the profits with Phillips Exeter Academy (Exeter), a private secondary school located in New Hampshire. Over time, Exeter concluded that the Company and the Fund had short-shifted it. When a disenchanted Exeter subsequently sued in New Hampshire's federal district court, the court determined that it lacked personal jurisdiction over the named defendants and dismissed the action. Exeter appeals. We affirm.

## I. BACKGROUND

Phillips resided in Florida and executed his will there. When he died in 1979, he held a power of appointment over all the shares in the Company. His will directed that the stock be offered in turn to a series of family-sponsored charitable foundations. After one declined the gift, the Fund accepted it.

The testator was an alumnus of Exeter and a stalwart supporter of his alma mater. His will obligated the Fund, as a condition to its receipt of the Company's stock, to vote the stock for the election of an Exeter representative to the Company's governing board and to pay Exeter "Five (5%) percent of the net income from such stock ... but not for more than twenty (20) years after [Phillips's] death," along with "Five (5%) percent of the net proceeds of the stock" if and when sold within the 20–year window. Phillips's will further provided that "any right to future income shall cease" upon a sale of the stock. Although these were the only firm conditions attached to the bequest, the testator expressed his hope that the recipient of the stock would continue to focus its charitable efforts on the causes and institutions it had favored when he was active in its direction and that it would give Exeter 5% of its own net income annually for 20 years. The Fund, as a matter of practice, apparently fulfilled the first of these velleities, continuing to devote most of its resources to familiar Florida charities (including Florida chapters of national organizations). But for aught that appears, the Fund showed no interest in channeling more money to Exeter.

Soon after the Florida probate proceedings were completed, two things happened. First, the Fund, acting at Exeter's behest, elected John Emery—an Exeter alumnus who lives and works in New York—to the Company's board. Second, H.E. Johnson, who then served as the chief executive officer of both the Fund and the Company—the two entities were under common control, and remained so thereafter—consulted Emery about the possibility of a lump-sum commutation of the Fund's present and future obligations to Exeter. Exeter turned a deaf ear to this entreaty, and the Fund proceeded to send checks annually to Exeter in New Hampshire, each equaling 5% of the dividend declared by the Company for the year in question.

Another settlement overture occurred in 1992, when Johnson's successor, James Hinson, visited the school's headmaster in New Hampshire. This visit—which marked the only time that an official of either defendant set foot in New Hampshire to conduct Exeter-related business—proved unavailing. The next year, Hinson again unsuccessfully proposed a settlement, this time by letter.

The Fund and the Company both altered their corporate forms in the years following the testator's demise. In 1980, the Fund converted from a private family foundation (known as the Della Phillips Foundation) to its present incarnation as a charitable support organization (known as the Howard Phillips Fund). This maneuver enabled it to hold the Company's stock indefinitely, without risk of escalating tax penalties. Compare 26 U.S.C. § 4943 (describing tax consequences for private foundations with "excess business holdings"), with id. § 509(a)(3) (excluding charitable support organizations from the definition of "private foundation"). In 1997, management merged the Company, until then an ordinary business corporation, into a newly established Delaware nonprofit corporation of the same name, with the result that the Fund became the sole member of the Company rather than its sole stockholder.

Despite the conversion of its stock interest to a membership interest, the Fund made no contemporaneous payment to Exeter.

Exeter received its next annual check—an unusually large one, geared to the Company's net income, rather than to its annual dividend—from the Company instead of the Fund. Shortly thereafter, Exeter filed suit, claiming that the Fund and the Company were liable in both tort and contract because (1) the transmitted payments, computed by the Fund on the basis of 5% of the Company's annual dividends, fell well short of the Fund's obligation to pay Exeter 5% of the Company's annual income; (2) the restructuring that had occurred was designed to thwart the testator's intention that the Fund sell the stock within 20 years and deliver 5% of the net sale proceeds to Exeter; and (3) in all events, when the Fund exchanged its stock ownership for a membership interest, it should have paid Exeter 5% of the Company's value. The district court did not address the substance of these allegations but, rather, granted the Fund's and the Company's joint motion to dismiss the action for want of personal jurisdiction. See Fed.R.Civ.P. 12(b)(2). This appeal ensued.

## II. ANALYSIS

■ New Hampshire's long-arm statute reaches to the full extent that the Constitution allows. See Phelps v. Kingston, 130 N.H. 166, 536 A.2d 740, 742 (1987); Computac v. Dixie News Co., 124 N.H. 350, 469 A.2d 1345, 1348 (1983). Aware of this reality, the court below sensibly focused on federal constitutional standards, and the parties—who agree on little else—have briefed the appeal in those terms. Thus, we proceed directly to the constitutional inquiry.

■ The Due Process Clause prohibits a court from imposing its will on persons whose actions do not place them in a position where they reasonably can foresee that they might be called to account in that jurisdiction. See World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100

S.Ct. 559, 62 L.Ed.2d 490 (1980). Although this regime is grounded in principles of fundamental fairness, it is written more in shades of grey than in black and white. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 486 n. 29, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1088 (1st Cir.1992).

■ The accepted mode of analysis for questions involving personal jurisdiction concentrates on the quality and quantity of the potential defendant's contacts with the forum. *See International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Thus, a defendant who has maintained a continuous and systematic linkage with the forum state brings himself within the general jurisdiction of that state's courts in respect to all matters, even those that are unrelated to the defendant's contacts with the forum. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Donatelli v. National Hockey League,* 893 F.2d 459, 462–63 (1st Cir.1990). Short of general jurisdiction, a court still may hear a particular case if that case relates sufficiently to, or arises from, a significant subset of contacts between the defendant and the forum. *See Helicopteros,* 466 U.S. at 414, 104 S.Ct. 1868; *Donatelli,* 893 F.2d at 462–63. Exeter has never claimed that the Fund and the Company are subject to the general jurisdiction of New Hampshire's courts. Hence, it is the latter type of personal jurisdiction—commonly called "specific jurisdiction"—that is at issue here.

■ The inquiry into specific jurisdiction lends itself to a tripartite analysis.

*See Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n,* 142 F.3d 26, 35 (1st Cir.1998); *Ticketmaster-N.Y., Inc. v. Alioto,* 26 F.3d 201, 206 (1st Cir. 1994). First, an inquiring court must ask whether the claim that undergirds the litigation directly relates to or arises out of the defendant's contacts with the forum. Second, the court must ask whether those contacts constitute purposeful availment of the benefits and protections afforded by the forum's laws. Third, if the proponent's case clears the first two hurdles, the court then must analyze the overall reasonableness of an exercise of jurisdiction in light of a variety of pertinent factors that touch upon the fundamental fairness of an exercise of jurisdiction. *See United Elec. Workers,* 960 F.2d at 1088 (discussing this aspect of the inquiry and dubbing these factors the "Gestalt factors"). An affirmative finding on each of the three elements of the test is required to support a finding of specific jurisdiction.[1]

■ The district court went no further than the first tier of the test in ruling that neither defendant was subject to its jurisdiction. Concluding, on largely undisputed facts, that the causes of action that Exeter pleaded did not arise out of or relate sufficiently to the defendants' contacts with New Hampshire, the court decided that Exeter had failed to make a prima facie showing adequate to justify an exercise of specific jurisdiction. We review this decision de novo, *see Foster–Miller, Inc. v. Babcock & Wilcox Can.,* 46 F.3d 138, 147 (1st Cir.1995), mindful that we are not wedded to the lower court's reasoning, but may affirm the judgment for any independent reason made manifest in the record, *see Hachikian v. FDIC,* 96 F.3d 502, 504 (1st Cir.1996).[2]

---

1. We caution, however, that the relative strength or weakness of the plaintiff's showing on the first two elements bears upon the third element (the overall fairness of an exercise of jurisdiction). *See Ticketmaster–N.Y.,* 26 F.3d at 207.

2. Jurisdictionally speaking, each defendant must stand or fall based on its own contacts

with the forum. Here, the Company's contacts with New Hampshire are more attenuated than the Fund's. Thus, we focus first on the Fund. Because we conclude that the district court lacked jurisdiction over it, *see* text *infra, a fortiori* it lacked jurisdiction over the Company.

■ The district court made a painstakingly thoughtful analysis. Its methodology was to compile a list of the Fund's activities in New Hampshire—transmitting checks into the state once a year, sending a few letters to Exeter, and visiting Exeter on one occasion in an effort to forge a settlement—and then to explore the interrelationship between Exeter's claims and these contacts. The court made this exploration on a claim-by-claim basis. As to the contract claim, the court noted that the relevant contract had been created in Florida (when the Fund accepted the conditional bequest) and that, if the contract was breached, the breach also occurred in Florida (where the Fund decided what amounts would be disbursed to Exeter). Turning to the tort claim, the court could discern no causal connection between the Fund's New Hampshire contacts and either the alleged breach of fiduciary duty or the injury resulting therefrom. Consequently, the court held that none of Exeter's claims was sufficiently related to the Fund's contacts with New Hampshire to warrant the exercise of personal jurisdiction.

■ We commend the lower court's decision to analyze the contract and tort claims discretely. Questions of specific jurisdiction are always tied to the particular claims asserted. *See United Elec. Workers,* 960 F.2d at 1089 (stating that "the defendant's in-state conduct must form an 'important, or [at least] material, element of proof' in the plaintiff's case") (quoting *Marino v. Hyatt Corp.,* 793 F.2d 427, 430 (1st Cir.1986)). In contract cases, a court charged with determining the existence *vel non* of personal jurisdiction must look to the elements of the cause of action and ask whether the defendant's contacts with the forum were instrumental either in the formation of the contract or in its breach. *See, e.g., id.* at 1089–90; *Jones v. Petty–Ray Geophysical, Geosource, Inc.,* 954 F.2d 1061, 1068 (5th Cir.1992); *Papachristou v. Turbines Inc.,* 902 F.2d 685, 686 (8th Cir.1990) (en banc). Because the elements differ in a tort case, a court charged with determining the existence *vel non* of personal jurisdiction must probe the causal nexus between the defendant's contacts and the plaintiff's cause of action. *See Nowak v. Tak How Invs., Ltd.,* 94 F.3d 708, 715–16 (1st Cir.1996); *Sawtelle v. Farrell,* 70 F.3d 1381, 1390 (1st Cir. 1995). Thus, the court below appropriately drew a distinction between Exeter's contract and tort claims. *See Mass. Sch. of Law,* 142 F.3d at 35.

Against this backdrop, we turn to Exeter's contentions that the district court conflated the relatedness and purposeful availment inquiries, and failed to recognize that, in gauging relatedness, a defendant's contacts with the forum state are not necessarily limited ·to moments of physical presence. In Exeter's view, the Fund's ongoing relationship with, and obligations to, a New Hampshire beneficiary comprise contacts that satisfy the relatedness requirement.

To be sure, there is a natural blurring of the relatedness and purposeful availment inquiries in cases (like this one) in which the alleged contacts are less tangible than physical presence; in such circumstances, an inquiring court must determine the extent to which the defendant directed an out-of-state activity at the forum state in order to ascertain whether the activity can be termed a contact at all. *See, e.g., id.* at 36. This determination bears at least a family resemblance to a determination of whether a defendant purposefully availed himself of the protections of the forum state. Notwithstanding this resemblance, however, the inquiries are different, *see* James Wm. Moore, *Moore's Federal Practice* § 108.42[2][a] (3d ed.1999), and we reject Exeter's contention that the district court confused them.

■ Exeter's principal argument along this line is that the fiduciary relationship between the parties should itself have been evaluated as a New Hampshire contact related to Exeter's claims. We agree with one premise that underlies this argument:

to be constitutionally significant, forum-state contacts need not involve physical presence. *See Burger King,* 471 U.S. at 476, 105 S.Ct. 2174. We disagree, however, with Exeter's attempt to invoke this premise here. It is not the relationship itself, but the content of the parties' interactions that creates constitutionally significant contacts. Thus, "[t]he relatedness requirement is not met merely because a plaintiff's cause of action arose out of the general relationship between the parties; rather, the action must directly arise out of the specific contacts between the defendant and the forum state." *Sawtelle,* 70 F.3d at 1389. The district court adhered to this rule and correctly focused on the forum-based activities surrounding the Fund's relationship with · Exeter—without regard to whether they entailed physical presence—rather than on the relationship itself.

Exeter's claim that this approach ignores the teachings of *Burger King* lacks force. As Exeter points out, *Burger King* upheld the Florida courts' exercise of jurisdiction over a Michigan franchisee of a Florida corporation in part because of the parties' "carefully structured 20-year relationship that envisioned continuing and wide-reaching [Florida] contacts." 471 U.S. at 480, 105 S.Ct. 2174.. But this snippet does not paint the whole picture: the *Burger King* Court made clear that the mere existence of a contractual relationship between an out-of-state defendant and an in-state plaintiff does not suffice, in and of itself, to establish jurisdiction in the plaintiff's home state. *See id.* at 478–79. Rather, "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing ... must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Id.* at 479, 105 S.Ct. 2174. The district court's approach was faithful to this instruction.

We next proceed to the court's implementation of the approach. As we have indicated, the relevant interactions between the parties and the proposed forum must be assayed in light of the nature of the plaintiff's claim. *See United Elec. Workers,* 960 F.2d at 1089. For example, in *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), the settlor had executed a trust indenture in Delaware, naming a Delaware trustee who administered the trust corpus in that state. *See id.* at 238, 78 S.Ct. 1228. The settlor later moved to Florida, but continued to receive payments from the trust. *See id.* at 252, 78 S.Ct. 1228. She also purported to exercise a power of appointment reserved in the trust indenture. *See id.* at 239, 78 S.Ct. 1228. Upon her death, certain legatees sued the trustee in a Florida court, seeking to declare the reservation invalid. *See id.* at 240–42, 78 S.Ct. 1228. Because the plaintiffs' claim focused on the validity *vel non* of the Delaware trust and the power-of-appointment provision, the Court held that the claim did not arise out of in-forum contacts even though the power of appointment had been exercised in Florida by a Florida resident who had been receiving regular payments there from the trustee. *See id.* at 251–52, 78 S.Ct. 1228. At the same time, however, the Court left open the possibility that a different claim—one focused on the propriety of the *exercise* of the power of appointment—might give rise to jurisdiction over the trustee in Florida. *See id.* at 253 & n. 25, 78 S.Ct. 1228.

*Hanson* suggests that we must determine the focal point of each of the plaintiff's claims and assess the interactions between the defendant and the forum state through that prism. Here, however, regardless of whether this dispute is viewed as a breach of contract case or a breach of fiduciary duty case, the same two landmarks predominate: the meaning of the testator's will and the Fund's fulfillment of the obligations that it undertook coincident to its acceptance of the bequest. Most of the relevant interactions (e.g., the execution of the will, the acceptance of the

bequest, and the payment decisions) occurred in Florida. The rest (e.g., the restructuring of the Company and the conversion of the Fund's ownership interest to a membership interest) occurred in Delaware. From this vantage point, Exeter's claim to jurisdiction in New Hampshire appears untenable. *See Bond Leather Co. v. Q.T. Shoe Mfg. Co.*, 764 F.2d 928, 934 (1st Cir.1985).

Exeter has another string to its jurisdictional bow. Notwithstanding that the formation of the relationship had nothing to do with New Hampshire, it asseverates that the *consequences* of the relationship involved contacts with New Hampshire sufficient to subject the Fund to the jurisdiction of the New Hampshire courts. *See Burger King*, 471 U.S. at 479, 105 S.Ct. 2174. Because the payments transmitted to New Hampshire were too niggardly, this thesis runs, the Fund's breach both of the contract and of its fiduciary duty occurred in New Hampshire.

▮ As to Exeter's tort claim, we think that this reasoning is specious. A breach of fiduciary duty occurs where the fiduciary acts disloyally. *See Young v. Colgate–Palmolive Co.*, 790 F.2d 567, 570–71 (7th Cir.1986); *McFarland v. Yegen*, 699 F.Supp. 10, 13 (D.N.H.1988). Consequently, any breach of fiduciary duty in this case occurred in Florida and arose when the Fund allegedly computed the payments in artificially low amounts. This means that the receipt of payment was merely an in-forum effect of an extra-forum breach and, therefore, inadequate to support a finding of relatedness. *See Mass. Sch. of Law*, 142 F.3d at 36; *Sawtelle*, 70 F.3d at 1390–91; *cf. Burger King*, 471 U.S. at 474, 105 S.Ct. 2174 (reiterating that the foreseeability of causing injury in another state, without more, is not a sufficient benchmark for exercising personal jurisdiction in that state). This makes eminent sense, for the receipt of payment in New Hampshire could not conceivably have *caused* the breach of the duty of loyalty of which Exeter complains. *See Ticketmaster–*

*N.Y.*, 26 F.3d at 207 (explaining that a main purpose of the relatedness requirement is to ensure that "the element of causation remains in the forefront of the due process investigation").

Exeter's contractual claim requires a different analysis. Although the injury resulting from a breach of fiduciary duty might be said to be complete when the fiduciary disregards his duty, *see Young*, 790 F.2d at 570, a contract arguably is breached where a promisor fails to perform, *see, e.g., Papachristou*, 902 F.2d at 686. Indeed, courts repeatedly have held that the location where payments are due under a contract is a meaningful datum for jurisdictional purposes. *See, e.g., Burger King*, 471 U.S. at 480, 105 S.Ct. 2174; *Ganis Corp. v. Jackson*, 822 F.2d 194, 198 (1st Cir.1987). Even so, that fact alone does not possess decretory significance. *See Kulko v. Superior Court*, 436 U.S. 84, 93, 97, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978) (finding no personal jurisdiction in California as to contractual claims against a father to modify a custody agreement entered into in New York, even though the agreement provided for support payments to the mother and minor children in California); *Hanson*, 357 U.S. at 252, 78 S.Ct. 1228; *Kerry Steel, Inc. v. Paragon Inds.*, 106 F.3d 147, 152 (6th Cir.1997); *see also Scullin Steel Co. v. National Ry. Utiliz. Corp.*, 676 F.2d 309, 314 (8th Cir.1982). Exeter offers no convincing argument as to why the location to which payments were sent is entitled to greater suasion here than in these cases.

In the last analysis, we agree with the district court that, as to both claims, Exeter has failed to make a prima facie showing of relatedness. We hasten to add, however, that even if the New Hampshire payments sufficed to show relatedness in respect to Exeter's breach-of-contract claim—the only close question among those discussed thus far—the lack of purposeful availment nevertheless would defeat jurisdiction. We explain briefly.

The purposeful availment test requires us to consider whether the Fund's contacts with New Hampshire "represent a purposeful availment of the privilege of conducting activities in [New Hampshire], thereby invoking the benefits and protections of [its] laws and making the defendant[s'] involuntary presence before the state's courts foreseeable." *United Elec. Workers*, 960 F.2d at 1089. Exeter argues that because the Fund knowingly accepted the conditions imposed upon the bequest, it in effect reached out to Exeter in New Hampshire. But to make a prima facie showing of purposeful availment, it is not enough to prove that a defendant agreed to act as the trustee of a trust that benefitted a resident of the forum state. *See Sawtelle*, 70 F.3d at 1392, 1394 (holding that lawyers' acceptance of an attorney-client relationship with New Hampshire clients was not purposeful availment vis-à-vis New Hampshire). Without evidence that the defendant actually reached out to the plaintiff's state of residence to *create* a relationship—say, by solicitation, *see, e.g., Nowak*, 94 F.3d at 716–17—the mere fact that the defendant willingly entered into a tendered relationship does not carry the day.

Even if a defendant's contacts with the forum are deemed voluntary, the purposeful availment prong of the jurisdictional test investigates whether the defendant benefitted from those contacts in a way that made jurisdiction foreseeable. *See Ticketmaster–N.Y.*, 26 F.3d at 207. Here, the Fund received a very large bequest as a result of its acceptance of the obligation to make certain payments to Exeter, but this benefice did not flow from any relationship with New Hampshire. Indeed, the annual payments sent to Exeter in New Hampshire comprise the Fund's only pertinent contacts with that state—and there is not so much as a hint that the Fund benefitted in any way from the protections of New Hampshire law in making these payments. *See Savin v. Ranier*, 898 F.2d 304, 307 (2d Cir.1990); *see also Bond Leather*, 764 F.2d at 934. The very exiguousness of these contacts suggests that the Fund could not reasonably have foreseen its susceptibility to suit in a New Hampshire court.[3] Hence, there was no purposeful availment. *See Hanson*, 357 U.S. at 253, 78 S.Ct. 1228; *Mass. Sch. of Law*, 142 F.3d at 37.

## III. CONCLUSION

We need go no further. Neither the Fund nor the Company has contacts with New Hampshire that are sufficiently related to the claims asserted in this case to permit the exercise of *in personam* jurisdiction. Moreover, such contacts as do exist and arguably relate to the plaintiff's claims fail to evince purposeful availment of the benefits and protections of New Hampshire law. For these reasons, an exercise of jurisdiction in New Hampshire would offend due process.[4]

***Affirmed.***

3. Exeter again attempts to analogize this case to *Burger King*, arguing that the Fund's forum-state contacts were "continuous and wide-reaching." But *Burger King* and this case are not fair congeners. The defendant in *Burger King* not only sent regular payments to the plaintiff in the forum state but also assumed the plaintiff's identity and submitted to a host of regulations that the plaintiff imposed as part of a relationship that the defendant initiated. *See* 471 U.S. at 480, 105 S.Ct. 2174. Thus, the defendant was intimately involved with the details of his association with Burger King on a daily basis. Here, by contrast, the Fund merely sent one check per year to Exeter.

4. We intimate no view on the merits of Exeter's claims. We do emphasize, however, that the district court's order of dismissal operates without prejudice to Exeter's right to refile its suit in a forum in which the named defendants are amenable to personal jurisdiction.