Raymarine v. Argonaut Computer          CV-02-021-B    08/01/02

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Raymarine, Inc.**

    **v.**

                              Civil No. 02-021-B
                              Opinion No. 2002 DNH 147

**Argonaut Computer, Inc.**


<u>MEMORANDUM AND ORDER</u>

Raymarine, Inc. has filed suit seeking a declaration that it properly terminated its contract with Argonaut Computer, Inc. Argonaut moves to dismiss the action for lack of personal jurisdiction and venue, or, in the alternative, to transfer the case to the United States District Court for the Southern District of California. For the reasons that follow, I deny Argonaut's motion.

## I. **BACKGROUND**[1]

Raymarine, a Delaware corporation, manufactures recreational

---

[1] The background facts are drawn from the parties' evidentiary submissions and are considered in the light most favorable to the plaintiffs. <u>See</u> <u>Foster-Miller, Inc. v. Babcock & Wilcox Canada</u>, 46 F.3d 138, 145 (1st Cir. 1995). Facts from the defendant's evidentiary submissions are included to the extent they are uncontradicted. <u>Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n</u>, 142 F.3d 26, 34 (1st Cir. 1998).

marine products including marine radars, fishfinders, autopilots, GPS instruments, VHF radios, and navigation software. Its headquarters for North and South America is located in Nashua, New Hampshire. The Nashua office oversees sales, customer support, technical support, product line management, inventory management, and contract purchase order management for both regions. Raymarine also has a technical facility in Portsmouth, United Kingdom, a facility in Ohio, and offices in Virginia and Florida.

Argonaut, a California corporation, develops, produces and markets rugged, high performance computer systems for use in marine, industrial or military settings. Argonaut is not licensed or registered to do business in New Hampshire, has no employees in New Hampshire, has never maintained an office here, and has never delivered any products to any address within the state.

The Argonaut Marine PC (the "Marine PC") is a rugged personal computer that is used on commercial and recreational boats. During January 2001, Argonaut and the recreational marine division of the Raytheon Company engaged in discussions concerning the potential purchase of Marine PCs. The discussions

ceased around January 30, 2001 (Raymarine's date of incorporation), when Raymarine purchased the assets of the recreational marine division.

Following the asset purchase, Richard Kane, the President and Chief Executive Officer of Raymarine, sent the President of Argonaut, George Kioutas, a letter expressing his interest in resuming discussions concerning the Marine PC. Mr. Kane sent the letter, dated February 9, 2001, from Raymarine's Nashua office on letterhead reflecting its Nashua address. Mr. Kioutas countersigned the letter and returned it to the Nashua office via facsimile.

Between February 9 and the end of March, the two parties negotiated a purchase agreement, with Mr. Kioutas and Terry Startsman (an employee in Raymarine's Virginia office) handling most of the negotiations. The two conducted discussions between California and Virginia via the telephone and on separate occasions held meetings in Florida and California. Mr. Kane also participated in telephone conversations concerning the purchase agreement from his office in Nashua.

Mr. Kioutas signed the completed contract in California on March 27, 2001, and sent it to Mr. Kane in Nashua, who executed

it on March 29.  The contract engaged the parties for three years, gave Raymarine exclusive rights (within the recreational and commercial marine markets) to the Marine PC, and provided a list of specifications which, among other things, required the Marine PC to be waterproof and resistant to high temperatures and excessive movement.  The agreement required Raymarine to purchase at least 2,000 units at an approximate cost of $4,000 per unit, giving the contract a minimum value of $8 million.  Argonaut was to ship the computers to Raymarine's Ohio facility once production began.  The contract also stipulated that Argonaut would purchase nine different sub-assemblies from Raymarine.

The Purchase Agreement, which identified Raymarine only as a Delaware corporation, included no forum selection clause, but designated New Hampshire law as the governing law.  The contract also referenced a non-disclosure agreement that the parties were to agree to later.  Raymarine ultimately drafted the disclosure agreement in its Nashua office and printed it on letterhead reflecting its Nashua address.  Mr. Kioutas signed the agreement in California on June 14, 2001, and sent it Nashua were it was executed by Mr. Kane on July 20, 2001.

In anticipation of the new product line, Raymarine hired Louis Chemi as its Product Line Manager for the Marine PC. Mr. Chemi's responsibilities were to include the marketing and coordination of the Marine PC line, and he was to be based out of Raymarine's Nashua office. Argonaut's limited interaction with Mr. Chemi occurred during his time in Virginia, prior to his relocation to New Hampshire.

The Marine PC was developed in California and Texas by Argonaut and its subcontractor Xplore. During the course of the product's development, Argonaut and Raymarine representatives met in Florida, Texas and the United Kingdom. The first tests of the prototypes took place at Raymarine's facility in Portsmouth, United Kingdom, on March 22 and 23 (prior to the Purchase Agreement's execution). The tests conducted by Raymarine measured the product's compliance with the Purchase Agreement's specifications. The Marine PC failed these tests.

As a result, numerous communications ensued between Raymarine and Argonaut concerning technical modifications. The discussions and meetings took place in California, Texas and the United Kingdom and included a Raymarine technician on loan to Argonaut to assist in rectifying the problems. During this time,

Argonaut directed billing and invoicing questions by telephone, in e-mails, and in correspondence to Raymarine's office in New Hampshire.

A second set of tests performed a month later (April 19-20) at the Portsmouth facility met the same result. Again, more communication took place between the Portsmouth facility and Xplore's Texas facility. A third round of tests was performed at the Portsmouth facility on August 22 and 28, and the prototypes failed to meet the specifications for a third time. As a result of the multiple product failures, Raymarine commenced discussions with Argonaut concerning the continued viability of the Purchase Agreement.

Employees at Raymarine's Nashua office continued to communicate with employees at Argonaut from late August until late October. The communications culminated with Raymarine declaring Argonaut in default and terminating the Purchase Agreement. Included in these communications was a letter from Mr. Kioutas to Mr. Kane discussing the possibility that Argonaut might sue Raymarine for breach of contract. This prompted Argonaut to send Raymarine a draft complaint naming it as a defendant in which New Hampshire was identified as the

jurisdiction in which the complaint would be filed.  In anticipation of Argonaut's threatened lawsuit, Raymarine filed this action seeking a declaratory judgment that it did not breach the Purchase Agreement.

## II.  PERSONAL JURISDICTION

### A.  Standard of Review

When a defendant contests personal jurisdiction under Fed. R. Civ. P. 12(b)(2), the plaintiff bears the burden of showing that a basis for asserting jurisdiction exists.  See Mass. Sch. of Law, 142 F.3d at 34; Rodriguez v. Fullerton Tires Corp., 115 F.3d 81, 83 (1st Cir. 1997).  In a case such as this, in which no evidentiary hearing has been held, I hold the plaintiff to a prima facie standard.  See Sawtelle v. Farrell, 70 F.3d 1381, 1386 n.1 (1st Cir. 1995) (citing United Elec. Radio and Mach. Workers of Am. (UE) v. 163 Pleasant St. Corp., 987 F.2d 39, 43 (1st Cir. 1993) [hereinafter Pleasant St. II]).

To make a prima facie showing of jurisdiction, a plaintiff may not rest on the pleadings.  Rather, he or she must "adduce evidence of specific facts" that support jurisdiction.  Foster-

Miller, 46 F.3d at 145; Pleasant St. II, 987 F.2d at 44.  In conducting my analysis, I take the facts offered by the plaintiff as true and construe them in the light most favorable to the plaintiff's jurisdictional claim.  See Mass. Sch. of Law, 142 F.3d at 34; Foster-Miller, 46 F.3d at 145.  I do not act as a fact-finder; instead I determine "whether the facts duly proffered, [when] fully credited, support the exercise of personal jurisdiction."  Rodriguez, 115 F.3d at 84 (citing Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir. 1992)).

While the prima facie standard is liberal, I need not "'credit conclusory allegations or draw farfetched inferences.'" Mass. Sch. of Law, 142 F.3d at 34 (quoting Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994)).  I also consider facts offered by the defendant, but only to the extent that they are uncontradicted.  See id.

B.    **Statutory and Constitutional Requirements**

When assessing personal jurisdiction in a diversity of citizenship case, the court "'is the functional equivalent of a state court sitting in the forum state.'"  Sawtelle, 70 F.3d at 1387 (quoting Ticketmaster, 26 F.3d at 204).  Accordingly, I must determine whether an exercise of jurisdiction is proper under

both the New Hampshire long-arm statute and the due process requirements of the federal constitution.  See id.; Foster-Miller, 46 F.3d at 144.  Because New Hampshire's long-arm statute is coextensive with the federal due process standard, however, I proceed directly to the constitutional due process analysis.  See Phelps v. Kingston, 130 N.H. 166, 171 (1987).

The "constitutional touchstone" for personal jurisdiction is "whether the defendant purposefully established 'minimum contacts' in the forum State."  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985) (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)); see also Sawtelle, 70 F.3d at 1388.  This "minimum contacts" inquiry is necessarily fact-specific, "involving an individualized assessment and factual analysis of the precise mix of contacts that characterize each case."  Pritzker v. Yari, 42 F.3d 53, 60 (1st Cir. 1994).  The ultimate objective of the due process "minimum contacts" standard is to ensure that the exercise of personal jurisdiction over a nonresident defendant does not offend "traditional notions of fair play and substantial justice.'" United Elec. Radio and Mach. Workers of Am. (UE) v. 163 Pleasant St. Corp., 960 F.2d 1080, 1087 (1st Cir. 1992) [hereinafter Pleasant St. I] (quoting Int'l

Shoe, 326 U.S. at 316).  If a defendant has even one meaningful contact with the forum, the exercise of personal jurisdiction is constitutionally proper.  See Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 717 (1st Cir. 1996) (citing McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957)); Pritzker, 42 F.3d at 61.

A court may assert authority over a defendant by means of either general or specific jurisdiction.  Mass. Sch. of Law, 142 F.3d at 34 (citing Donatelli v. Nat'l Hockey League, 893 F.2d 459, 462-463 (1st Cir. 1990)); Foster-Miller, 46 F.3d at 144.  A defendant engaged in continuous and systematic activity in a forum is subject to general jurisdiction in that forum with respect to all causes of action, even those unrelated to the defendant's forum-based activities.  Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999) (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984); Donatelli, 893 F.2d at 462-63).

Specific jurisdiction exists if there is "a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities."  Mass. Sch. of Law, 142 F.3d at 34.  That is, a court may exercise specific jurisdiction if the plaintiff's case "relates sufficiently to, or arises from, a significant subset of

-10-

contacts between the defendant and the forum." Phillips Exeter, 196 F.3d at 288; see also Pleasant St. I, 960 F.2d at 1088-89. In this case, Raymarine argues only that this court has specific personal jurisdiction over Argonaut.

## C. Analysis

To determine whether the exercise of specific jurisdiction is consistent with due process, the First Circuit has developed a three-part test that evaluates: (1) relatedness, (2) purposeful availment (or "minimum contacts"), and (3) reasonableness. See Mass. Sch. of Law, 142 F.3d at 35; Nowak, 94 F.3d at 712-13. A finding of specific jurisdiction requires that each of the three components be satisfied. Phillips Exeter, 196 F.3d at 288.

### 1. Relatedness

I focus first on the relatedness prong of the three-part test; a prong intended to be a flexible and relaxed standard. See Sawtelle, 70 F.3d at 1389; Pritzker, 42 F.3d at 61. Under the relatedness test I must determine whether the plaintiff's claims arise out of, or are related to, the defendant's forum contacts. See Mass. Sch. of Law, 142 F.3d at 35; Sawtelle, 70 F.3d at 1389. When, as here, the plaintiff asserts a contract

claim, I must determine "whether the defendant's contacts with the forum were instrumental either in the formation of the contract or in its breach." Phillips Exeter, 196 F.3d at 289.

As discussed below, Argonaut's New Hampshire contacts were instrumental in both the formation and alleged breach of the Purchase Agreement and thus satisfy the relatedness requirement. Argonaut's contacts with Raymarine's Nashua office concerning the contract's formation included responding to the initial offer to negotiate, conducting at least some negotiations with Nashua via the phone, and forwarding the signed contract to Nashua for execution. Additionally, the Confidentiality Agreement, an integral part of the Purchase Agreement, was drafted in Nashua, sent to Argonaut from Nashua, and returned to Nashua by Argonaut for execution. These communications by Argonaut constitute forum contacts for purposes of this analysis. See Sawtelle, 70 F.3d at 1389-90 (citing Burger King, 471 U.S. at 476); Rodriguez v. Dixie S. Indus., 113 F. Supp. 2d 242, 251-52 (D.P.R. 2000).

Argonaut also had contacts with Raymarine's Nashua office that were instrumental to the alleged breach of the Purchase Agreement. These communications included a letter from Mr. Kioutas to Mr. Kane discussing Argonaut's view that any

-12-

termination by Raymarine would be considered a breach of the contract and threatening legal action if Raymarine did not complete its contract obligations.  See id.

As a result, Argonaut's contacts with New Hampshire are sufficient to satisfy the due process requirement that the claims arise directly out of, or are related to, its contacts with the forum.

## 2. **Purposeful Availment**

In evaluating whether Argonaut purposefully availed itself of the privilege of conducting business in New Hampshire, I consider "whether a defendant has 'engaged in any purposeful activity related to the forum that would make the exercise of jurisdiction fair, just, or reasonable.'" Sawtelle, 70 F.3d at 1391 (citing Rush v. Savchuk, 444 U.S. 320, 329 (1980)).  The purposeful availment requirement is intended to protect an out-of-state defendant from the forum's exercise of personal jurisdiction based upon the defendant's "random, isolated, or fortuitous' contacts with the forum state." Sawtelle, 70 F.3d at 1391 (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984)).  Accordingly, the First Circuit requires both voluntariness and foreseeability to exist before the purposeful

-13-

availment prong is satisfied.  See id.; Ticketmaster-New York, Inc., 26 F.3d at 207.

For a defendant's contacts with the forum to be considered voluntary, they must not be based upon "the unilateral actions of another party or a third person."  For the forum's exercise of personal jurisdiction to be deemed foreseeable, the out-of-state defendant must establish a "continuing obligation between itself and the forum state."  Sawtelle, 70 F.3d at 1393.  In addition, the defendant's contacts must be such that the defendant would "reasonably anticipate being haled into court there."  Nowak, 94 F.3d at 716.

In a contract action, the mere existence of a contractual relationship between a forum plaintiff and an out-of-state defendant is insufficient to establish purposeful availment.  See Phillips Exeter, 196 F.3d at 290; Ganis Corp. of Cal. v. Jackson, 822 F.2d 194, 197 (1st Cir. 1987).  Rather, using a "contract-plus" analysis, see Ganis Corp., 822 F.2d at 197, I must consider additional factors, including:  "(1) the prior negotiations between the parties and the contemplated future consequences of the [contract]; (2) the terms of [the contract]; and (3) the parties' actual course of dealing."  U.S.S. Yachts, Inc. v. Ocean

-14-

Yachts, Inc., 894 F.2d 9, 12 (1st Cir. 1990); Ganis Corp., 822 F.2d at 197-98.

I conclude that Raymarine has alleged and provided evidence of jurisdictional facts which, if true, demonstrate that Argonaut's contacts with New Hampshire (1) were voluntary, in that they were not the product of Raymarine's unilateral actions; and (2) created an on-going relationship with a forum resident, thereby making it foreseeable that Argonaut would be haled into court in New Hampshire. Argonaut's contacts were voluntary because the relationship between the two parties began with a letter from Raymarine's Nashua office, which Argonaut signed and returned, thus putting Argonaut on notice that it was dealing with a New Hampshire company. Moreover, Argonaut initiated and responded to numerous communications with the Nashua office once the Purchase Agreement was executed. See Nowak, 94 F.3d at 716.

The parties' contract, which involves the purchase and sale of relatively complex products modified to fit the specific requirements of Raymarine's project, was the result of extensive negotiation. While Argonaut was not physically present in New Hampshire during the negotiation and contract period, it did direct communications, by telephone, fax, letter and e-mail, into

the state.  See Sawtelle, 70 F.3d at 1389-90 ("The transmission of information into [the forum] by way of telephone or mail is unquestionably a contact for purposes of our analysis."); see also Mass. Sch. of Law, 142 F.3d at 36; Pleasant St. I, 960 F.2d at 1090.

The terms of the parties' contract also support the exercise of personal jurisdiction over Argonaut.  The Purchase Agreement included a choice of law clause which identified New Hampshire law as the governing law.  The terms of the contract thus put Argonaut on notice that it was dealing with a New Hampshire buyer.  See Ganis Corp., 822 F.2d at 198 ("While not conclusive, a [choice of law provision] further tips the scales in favor of [plaintiff] since a contractual provision adopting a forum state's laws combined with the five-year duration of the relationship 'reinforce[s] [the nonresident defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there.'") (quoting Burger King, 471 U.S. at 482) (alterations in original).

Finally, the future consequences of the three-year contractual relationship contemplated by the parties should have put Argonaut on notice that it might be haled into court in

-16-

Raymarine's principal place of business, New Hampshire.[2]  New Hampshire houses Raymarine's headquarters for North and South America and handles a number of important responsibilities for the region.  This being the case, any significant contract with Raymarine in the Western hemisphere would inevitably entail contact with its Nashua office.[3]  See Burger King, 471 U.S. at 480.  Argonaut's awareness that Mr. Chemi (hired to oversee the Marine PC line) would be located in New Hampshire further supports this conclusion.

3.  **Reasonableness**

The third prong of the specific jurisdiction analysis focuses on the reasonableness of the forum's exercise of jurisdiction.  In particular, reasonableness is assessed "in light of a variety of pertinent factors that touch upon the fundamental fairness of an exercise of jurisdiction." Phillips

---

[2] That Argonaut's drafted complaint elected to use New Hampshire as its forum indicates at the very least that Argonaut was aware of the role and importance of Raymarine's Nashua office to Raymarine as a whole.

[3] Not only did some of the negotiations take place through the New Hampshire office, but Argonaut addressed billing and invoicing issues and contract termination issues with the Nashua office within the first six months of the contract.

-17-

Exeter, 196 F.3d at 288. The First Circuit identifies five fairness considerations, dubbed the "Gestalt" factors, that are determinative of the reasonableness prong: "(1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; (5) and the common interests of all sovereigns in promoting substantive social policies." Sawtelle, 70 F.3d at 1394; see also Pleasant St. I, 960 F.2d at 1088. While none of these factors strongly favors either party's position, on balance they lend support to Raymarine's claim that this court has personal jurisdiction.

### a. The Defendant's Burden of Appearance

First, although Argonaut may be inconvenienced by litigating this case in New Hampshire, it has not demonstrated that defending itself here imposes a special or unusual burden on it. See Pritzker, 42 F.3d at 64. While some of Argonaut's employees might find it more convenient if this case were tried in California, other employees and employees of Argonaut's Texas subcontractor who are probable witnesses will be equally

-18-

inconvenienced regardless of whether this action is tried here or in California.

### b. The Forum State's Adjudicatory Interest

Second, New Hampshire has an interest in providing a convenient forum for companies that maintain regional headquarters here.  See Burger King, 471 U.S. at 473.  While a state's interest is certainly greater when the contract concerns a product manufactured or used exclusively in the forum state, the state's interest does not dissipate entirely when these circumstances are absent.  See In-Flight Devices Corp. v. Van Dusen Air, Inc., 466 F.2d 220, 232 (6th Cir. 1972).

### c. The Plaintiff's Interest in Obtaining Convenient Relief

Third, Raymarine has selected New Hampshire as the forum in which to bring its action against Argonaut.  With respect to measuring Raymarine's convenience, I must pay some deference to its choice of forum.  See Sawtelle, 70 F.3d at 1395 ("[A] plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience.").

### d. The Administration of Justice

The judicial system's interest in obtaining the most

effective resolution to the controversy offers no particular guidance for the present case.

### e. Pertinent Policy Arguments

The final "Gestalt" factor considers the "common interests of all sovereigns in promoting substantive social policies." Sawtelle, 70 F.3d at 1395. The only real argument falling under this factor concerns the use of New Hampshire law to govern issues arising under the contract. In general, courts in New Hampshire will be better equipped to adjudicate cases involving New Hampshire law then will courts in an alternative forum.

For the above-stated reasons, this court has personal jurisdiction over Argonaut.

## III. VENUE

### A. Standard of Review

While the First Circuit has not specified the standard a district court should use in resolving venue disputes prior to trial, it has determined the standard in the related context of a challenge to personal jurisdiction. See Boit, 967 F.2d at 675-77. In cases where no hearing is held, the court makes only a

prima facie determination of jurisdiction. Id. Accordingly, the court does not find facts, but rather accepts the truth of the plaintiff's factual averments to the extent that they are supported by evidence of specific facts set forth in the record. Id. Since at least one other circuit requires district courts to use a similar standard in venue disputes, see Home Ins. Co. v. Thomas Indus., Inc., 896 F.2d 1352, 1355 (11th Cir. 1990), and the parties have not drawn my attention to any precedent suggesting a different approach, I will determine the venue question under the prima facie standard outlined in Boit.

B.   **Analysis**

The general venue statute provides that an action may be brought in any "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . ." 28 U.S.C. § 1391(b). When applying this provision, a court must look "not to a single 'triggering event' prompting the action, but to the entire sequence of events underlying the claim." Uffner v. La Reunion Francaise, S.A., 244 F.3d 38, 42 (1st Cir. 2001). The test is the same whether the claim sounds in contract or tort. See id. at 41. In this circuit, a court must not confine its inquiry to the acts of the defendant but

-21-

instead must employ a more "holistic" view of the problem. See id. at 42 n.6. Finally, an event need not be in dispute to comprise a substantial event giving rise to the claim. See id. at 43. Using this standard, venue may well exist in several different jurisdictions where a substantial part of the events giving rise to the claim took place. See id. at 42; First of Michigan Corp. v. Bramlet, 141 F.3d 260, 263 (6th Cir. 1998).

In this case, I determine that venue is proper for many of the same reasons that this court has personal jurisdiction over Argonaut. Argonaut's forum contacts were instrumental in the formation, maintenance and termination of the contract and thus were a substantial part of the events which gave rise to this claim. Accordingly, I reject Argonaut's venue challenge.


## IV.  TRANSFER OF VENUE

### A.  Standard of Review

Motions to transfer are governed by 28 U.S.C. § 1404(a), which applies if venue is proper in the court where the action was filed, and § 1406(a), which applies when venue is improper in the original court. Since venue is proper in the instant case, I

-22-

focus only on the requirements of § 1404(a).

A district court may transfer an action to another district pursuant to § 1404(a) if two requirements are met. First, the court must determine that the action "might have been brought" in the transferee district court originally. Van Dusen v. Barrack, 376 U.S. 612, 616 (1964). Second, the court must determine that the transfer will enhance the convenience of the parties and the witnesses and promote the interest of justice. Id.

If the first requirement is met, the district court enjoys considerable discretion in making the transfer decision. Norwood v. Kirkpatrick, 349 U.S. 29, 30, 32 (1955). When a court contemplates a transfer based on § 1404(a), it should consider: (1) the convenience of the parties and witnesses; (2) the relative ease of access to documents needed for evidence; (3) the cost of procuring willing witnesses; and (4) any practical problems associated with trying the case most expeditiously and inexpensively. Coady v. Ashcraft & Gerel, 223 F.3d 1, 11 (1st Cir. 2000); F.A.I. Elecs. Corp. v. Chambers, 944 F. Supp. 77, 80-81 (D. Mass. 1996) (citation omitted). "Of those factors, the convenience to the expected witnesses is probably the most important factor . . . ." Fairview Mach. & Tool Co., Inc. v.

Oakbrook Int'l, Inc., 56 F. Supp. 2d 134, 141 (D. Mass. 1999) (citation and internal quotation marks omitted).

A defendant seeking to transfer venue bears the "substantive burden" of showing that the factors "predominate" in favor of transfer. Buckley v. McGraw-Hill, Inc., 762 F. Supp. 430, 439 (D.N.H. 1991). "The Supreme Court has held that '[u]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'" Id. (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947)).

B. **Analysis**

Argonaut argues that even if personal jurisdiction and venue are proper in New Hampshire, I should exercise my discretion and transfer the case to the Southern District of California. In support of this argument, Argonaut alleges that: (1) the claim could be brought in California because a substantial part of the events or omissions giving rise to the claim occurred there; (2) few evidentiary items are located in New Hampshire while many relevant materials are located in California; and (3) witnesses essential to establishing Argonaut's case reside in California

while few of Raymarine's witnesses reside in New Hampshire.[4]

On balance, Argonaut has not demonstrated that transferring this action will enhance the convenience of the parties and witnesses and promote the interest of justice. See Van Dusen, 376 U.S. at 616. Although the Marine PC's were manufactured in California and Texas and employees at both locations will likely be called on to testify, so too will Raymarine employees in New Hampshire and the United Kingdom. In fact, New Hampshire serves as a far better geographic midpoint for the many locations from which witnesses might come than does California. Moreover, documents relating to the claim are easily transportable to this district. Finally, the vast majority of witnesses likely to be called are employees of one of the two parties, substantially lowering risk that venue will preclude their appearance. For these reasons, I will not disturb Raymarine's choice of forum. See Buckley, 762 F. Supp. at 439.

_____

[4] Since Argonaut fails to demonstrate that transferring the case enhances the parties' and witnesses' convenience or promotes the interest of justice, I need not address whether the action may have been brought in California originally.

-25-

## V.  <u>CONCLUSION</u>

For the reasons stated above, Argonaut's motion to dismiss for lack of personal jurisdiction and venue or, in the alternative, to transfer venue to the United States District Court for the Southern District of California (Doc. No. 5) is denied.

SO ORDERED.


_____
Paul Barbadoro
Chief Judge

August 1, 2002

cc:  W. Wright Danenbarger, Esq.
     David B. Wilson, Esq.