**ART TECHNOLOGY GROUP, INC., Plaintiff,**

v.

**PURITAN'S PRIDE, INC., Defendant.**

**Civil Action No. 09–11937–PBS.**

United States District Court, D. Massachusetts.

May 27, 2010.

Linda S. Agnew, Stanley A. Camhi, Joanne L. Oweis, Jaspan Schlesinger LLP, Garden City, NY, for Defendant.

Michael G. Andrews, Business Litigation Associates, Stephen E. Kesselman, Donovan Hatem, LLP, Irwin B. Schwartz, Petrie Schwartz LLP, Boston, MA, for Plaintiff.

## ORDER

PATTI B. SARIS, District Judge.

"After review of the objections, I adopt the Report and Recommendation and deny the Motion to Dismiss or to Transfer."

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO DISMISS OR TO TRANSFER

DEIN, United States Magistrate Judge.

## I. INTRODUCTION

In this action, the plaintiff, Art Technology Group, Inc. ("ATG"), claims that defendant, Puritan's Pride, Inc. ("Puritan"), breached a contract between the two parties by failing to pay amounts due thereunder. Presently before the court is Puritan's motion to dismiss for lack of personal jurisdiction and improper venue, pursuant to Fed.R.Civ.P. 12(b)(2) and 12(b)(3) and 28 U.S.C. § 1406(a), or alternatively, to transfer the case to the United States District Court for the Eastern District of New York, pursuant to 28 U.S.C. § 1404(a). (Docket No. 21). For the reasons detailed herein, this court finds that Puritan's activities in connection with the contract between the parties are sufficiently purposeful and related to the Commonwealth of Massachusetts that this court's assertion of specific jurisdiction over Puritan will not offend traditional notions of justice and fair play.[1] This court further finds that venue in this court is appropriate and that Puritan has not demonstrated that the action nevertheless should be transferred to New York. Therefore, and for the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that Puritan's motion be DENIED.

## II. STATEMENT OF FACTS

### Standard of Review of Record

■ "On a motion to dismiss for want of in personam jurisdiction, Fed.R.Civ.P. 12(b)(2), the plaintiff ultimately bears the burden of persuading the court that jurisdiction exists." Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir.1998), and cases cited; Adams v. Adams, 601 F.3d 1, 4 (1st Cir.2010) (same). "Faced with a motion to dismiss

---

1. The plaintiff contends that this court may assert specific jurisdiction over Puritan; there is no claim of general jurisdiction.

for lack of personal jurisdiction, [this court] may choose from among several methods for determining whether the plaintiff has met its burden." *Adelson v. Hananel,* 510 F.3d 43, 48 (1st Cir.2007) (internal quotation and citation omitted). "When a district court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, as in this case, the 'prima facie' standard governs its determination." *United States v. Swiss Am. Bank, Ltd.,* 274 F.3d 610, 618 (1st Cir.2001). To meet its burden, the plaintiff must "demonstrate the existence of every fact required to satisfy both the forum's long-arm statute and the Due Process Clause of the Constitution." *Negron–Torres v. Verizon Commc'ns, Inc.,* 478 F.3d 19, 24 (1st Cir.2007). Under this standard, the court will "draw the facts from the pleadings and the parties' supplementary filings, including affidavits." *Lyle Richards Intern., Ltd. v. Ashworth, Inc.,* 132 F.3d 111, 112 n. 1 (1st Cir.1997). The court will then "take specific facts affirmatively alleged by the plaintiff as true (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim." *Mass. Sch. of Law,* 142 F.3d at 34. It will then "add to the mix facts put forward by the defendants, to the extent that they are uncontradicted." *Id.* However, the court will not "credit conclusory allegations or draw far-fetched inferences." *Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 203 (1st Cir.1994). Applying this standard to the instant case, the relevant facts are as follows.[2]

### The Parties

Plaintiff ATG is a Delaware corporation with its principal place of business in Cambridge, Massachusetts. (Compl. ¶ 6). ATG is a software business that develops and distributes e-Commerce programs that "are used across web, e-mail, call-center, and mobile customer communication channels." (*Id.* ¶ 11). ATG's software programs were developed primarily in Massachusetts. (Brearley N.Y. Aff. ¶ 2). In addition to software, ATG offers technical support and various services including training, project management, consulting, and website development and configuration. (Compl. ¶ 11). ATG's primary technical support call center is in Massachusetts. (Brearley N.Y. Aff. ¶ 3).

Puritan is a New York corporation with a principle place of business in Ronkonkoma, New York and an office in Holbrook, New York. (Compl. ¶ 7; Pappas Aff. ¶ 2). Puritan does not have an office, place of business or any employees in Massachusetts, nor has it placed or targeted any advertising to Massachusetts. (Pappas Aff. ¶ ¶ 4, 5). Puritan sells vitamins and various other nutritional supplements directly to consumers, primarily through telephone and internet sales. (*Id.* at ¶ 3). According to its website, Puritan produces over 2 billion pills and packages over 14 million bottles each month and has over six million customers. (Compl. ¶ 12).

### Business Transaction between the Parties

During 2007, Puritan "began exploring the possibility of upgrading and transform-

---

**2.** The facts are derived from the following materials: (1) Complaint (Docket. No. 1) ("Compl.") and the exhibits attached thereto ("Compl. Ex. ___"); (2) Affidavit of Dennis Brearley (Docket No. 11) ("Brearley Aff."); (3) Affidavit of Robert King (Docket No. 12) ("King Aff."); (4) Affidavit of Steven Pappas (Docket No. 25) ("Pappas Aff."); (5) Affidavit of Linda S. Agnew (Docket No. 27) ("Agnew Affidavit"); (6) Affidavit of Dennis Brearley in Further Support of Mot. to Dismiss filed in New York litigation (Doc. No. 36 Ex. A) ("Brearley N.Y. Aff."); and (7) Affidavit of Steven Pappas filed in New York litigation (Ex. B. to Docket No. 36) ("Pappas N.Y. Aff.") and the exhibits attached thereto ("Pappas N.Y. Aff. Ex.___").

ing its existing e-commerce platform to an entirely new platform ... [which] would include new infrastructure, new software and reconfigured content" (the "Project"). (Pappas N.Y. Aff. ¶ 4). From April 29–May 2, 2007, ATG hosted a "customer conference" in South Carolina. (*Id.* at ¶ 5). Certain Puritan representatives attended this conference to obtain information about ATG and the services it could provide in connection with the Project. (*Id.*). ATG and Puritan subsequently embarked on negotiations spanning a number of months regarding the retention of ATG on the Project. (Brearley N.Y. Aff. at ¶ 5). These negotiations included approximately 20 phone calls and 50–75 e-mails between Puritan and ATG's employees in Massachusetts. (*Id.*). Additionally, in April of 2008, Puritan representatives traveled to Massachusetts, where, over the course of three days, the parties discussed the potential agreement. (*Id.* at ¶ 6).

The extensive negotiations concluded when, on June 12, 2008, the parties entered into "Master License Agreement No. NBTY0608" (the "Agreement"). (Compl. ¶ 13). The Agreement consists of: (1) the Master Licensing Agreement ("MLA"), which provides for the general terms and conditions of the contract, including the software licensing agreement between Puritan and ATG, of which paragraph 5.2 obligates Puritan to pay ATG on an annual basis for "Support and Maintenance"; (2) Addendum A, which provides for ATG's support and maintenance services for the software; and (3) Addendum B, which provides for Professional Services to be rendered by ATG on Puritan's behalf. (*Id.* at ¶¶ 24–14; *see* Compl. Ex. A). Addendum B of the Agreement provides, in part, that ATG would provide Professional Services pursuant to individual "Statements of Work," each of which would include "a general description of the Professional Services to be performed by ATG and an

estimate of the time and materials to be charged." (Compl. ¶¶ 14, 21).

On July 10, 2008, ATG and Puritan entered into the first Statement of Work. (*Id.* at ¶ 23). On September 29, 2008, the parties entered into a second and third Statement of Work. (*Id.* at ¶¶ 25, 26). All three Statements of Work regard various changes and improvements to Puritan's website, and list ATG's Service Delivery Manager, Dennis Brearley, and his Massachusetts contact information, as ATG's point of contact for the project. (*Id.* ¶¶ 23, 25, 26; *see* Compl. Ex. B, E, F). ATG continued to work on the Project through early December 2008. (Compl. ¶ 30). Over the course of ATG's work on the Project, Puritan was in frequent e-mail and telephone contact with Dennis Brearley, Katerina Dobes and Kerwin Moy, the ATG employees who were supervising ATG's work on the Project, all of whom worked in Massachusetts. (Brearley N.Y. Aff. ¶¶ 8–11). However, significant on-site services were provided in New York by ATG. (Pappas N.Y. Aff. ¶ 23).

In December 2008, Puritan fired Mr. Semerkant and Mr. Canton, Puritan's lead employees on the Project, in addition to other employees associated with the Project. (Compl. ¶ 30). These former employees are located in New York. (Pappas N.Y. Aff. ¶ 21). On December 10, Puritan initially instructed ATG by telephone to stop all work on the Project and formally terminated all Statements of Work and other purchase orders by letter delivered to ATG headquarters in Cambridge, Massachusetts, dated December 22, 2008. (Compl. ¶ 30 & Pappas N.Y. Aff. Ex. D).

ATG submitted six invoices for its work on the Project through October 23, 2008, all of which were paid in full on a timely basis. (Compl. ¶¶ 24, 28). From October 29, 2008 through November 28, 2008, ATG

continued to work on the Project and submitted four additional invoices from Massachusetts for Professional Services. (*Id.* at ¶ 29). While Puritan did not dispute these invoices, it also did not pay them. (*Id.*). Upon notification of cancellation, ATG stopped working on the Project, but from December 17, 2008 to January 27, 2009, submitted six additional invoices from Massachusetts for previously performed work, which remain unpaid. (*Id.* at ¶ 31). On September 8, 2009, from his office in Cambridge, Massachusetts, Robert King, ATG's Vice President of Professional Services, called Puritan CEO Harvey Kamil, whereupon Kamil "informed ATG that it should file a lawsuit if ATG wanted to procure payment of the unpaid invoices." (*Id.* at ¶ 34, King Aff. ¶ 6). ATG contends that ten invoices remain unpaid, totaling $314,784.03. (Compl. ¶ 32).

■ Before the instant suit was commenced, Puritan had filed, but not served, an action against ATG in New York state court, which was removed to the Eastern District of New York (the "New York Action"). (Agnew Aff. at ¶ 2). There, Puritan claims that the demise of the Project was due to the failures of a third party contractor, McFayden Consulting Group, Inc. ("McFayden"), that ATG recommended to Puritan.[3] (Agnew Aff. at Ex. A). Puritan conceded at oral argument that the present action should be considered "first filed."[4]

Additional facts will be provided below where appropriate.

## III. *ANALYSIS*

Puritan argues for dismissal on two bases: (1) that Massachusetts lacks personal jurisdiction over Puritan, and therefore the present action should be dismissed pursuant to Fed.R.Civ.P. 12(b)(62); and (2) the district of Massachusetts is not a proper venue under 28 U.S.C. § 1391(a), and therefore the present action should be dismissed pursuant to Fed.R.Civ.P. 12(b)(3) and 28 U.S.C. § 1406(a). In the alternative, Puritan argues that this court should exercise its discretion and transfer the present action to the Eastern District of New York, pursuant to 28 U.S.C. § 1404(a).

### A. *Personal Jurisdiction Analysis*

"Applying the prima facie standard, [plaintiff] bears the burden of establishing . . . . that the Massachusetts long-arm statute grants jurisdiction over [defendant] and that the exercise of that jurisdiction comports with the Due Process Clause of the Fifth Amendment." *Adelson,* 510 F.3d at 48. This court proceeds "directly to the constitutional analysis, because the Supreme Judicial Court of Massachusetts has interpreted the state's long-arm statute as an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States." *Phillips v. Prairie*

---

**3.** Puritan has brought a separate suit in New York state court against McFayden.

**4.** Although defendant's New York state claim was technically initiated first in that Puritan purchased an index number in August 2009 and filed a "summons with notice," Puritan did not serve the summons until after ATG initiated this action. A complaint was not filed until January 15, 2010. While this is in compliance with New York law, "the well

established rule" under New York law is that "an action commenced merely by service of a summons with notice is not a 'prior action pending' [for the purposes of the first-filed rule]; service of a complaint is required." *Kevorkian v. Harrington,* 158 Misc.2d 464, 601 N.Y.S.2d 522, 524 (N.Y.Sup.Ct.1993). The parties, and this court, therefore proceed with the understanding that plaintiff's Massachusetts àction is "first filed."

*Eye Ctr.*, 530 F.3d 22, 26 (1st Cir.2008) (quotations and citations omitted).

 Under the federal constitution, due process requires the court to determine whether the defendant has maintained "certain minimum contacts" with the forum state such that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quotation and citation omitted). "Jurisdiction is proper . . . where the contacts proximately result from actions by the defendant *himself* that create a substantial connection with the forum State." *Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano County*, 480 U.S. 102, 109, 107 S.Ct. 1026, 1030, 94 L.Ed.2d 92 (1987) (quotations and citation omitted).

 "A district court may exercise authority over a defendant by virtue of either general or specific jurisdiction." *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 51 (1st Cir.2002) (internal citation omitted). Here, plaintiff claims that this court has specific jurisdiction over defendant.[5] "Specific jurisdiction exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities, such as when the litigation itself is founded directly on those activities." *Mass. Sch. of Law*, 142 F.3d at 34.

 The First Circuit employs a three-part analysis to determine whether there are sufficient contacts between the defendant and the forum state to exercise specific personal jurisdiction over a defendant. *See Sawtelle v. Farrell*, 70 F.3d 1381, 1388–89 (1st Cir.1995). First, the court must decide whether the claim underlying the litigation "relates to or arises out of the defendant's contacts ᐧwith the forum." *Phillips Exeter Acad. v. Howard Phillips Fund*, 196 F.3d 284, 288 (1999). Second, the court must determine whether the defendant's contacts with the forum "represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." *Sawtelle*, 70 F.3d at 1389. Finally, the exercise of personal jurisdiction must be reasonable in light of certain "gestalt factors." *Id.* at 1394. More specifically, the court must consider:

> (1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies.

*Id.* "An affirmative finding on each of the three elements of the test is required to

---

**5.** Plaintiff suggests in a footnote that this court "may also have general jurisdiction over Puritan." (Pl. Opp. Mem. (Docket No. 35) at 13 n. 4). However, the First Circuit has "repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived." *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 60 n. 17 (1st Cir.1999), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). *See also Redondo–Borges v. U.S. Dep't of Housing & Urban Dev.*, 421

F.3d 1, 6 (1st Cir.2005) ("Few principles are more sacrosanct in this circuit than the principle that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.' ") (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990)). In any event, this court finds no facts to suggest that this court may exercise general jurisdiction over Puritan, and therefore this court only addresses ATG's claim of specific jurisdiction.

support a finding of specific jurisdiction." *Phillips Exeter Acad.*, 196 F.3d at 288.

### 1. *Relatedness*

■■■■ "[Plaintiff's] claims sound in contract, so we look to whether the defendant's activity in the forum state was instrumental either in the formation of the contract or its breach." *Adams*, 601 F.3d at 6 (quotation omitted). "[T]o be constitutionally significant, forum-state contacts need not involve physical presence." *Phillips Exeter Acad.*, 196 F.3d at 290. However, "the action must directly arise out of the specific contacts between the defendant and the forum state." *Sawtelle*, 70 F.3d at 1389.

■■■ "A contract, by itself, cannot automatically establish minimum contacts." *Swiss Am. Bank, Ltd.*, 274 F.3d at 621. "Thus, 'prior negotiations and contemplated future consequences, along with ... the parties' actual course of dealing ... must be evaluated in determining whether the defendant has minimum contacts with the forum." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528 (1985)). Here, the court finds that Puritan's contacts with Massachusetts were instrumental in the formation and breach of the Agreement.

The evidence shows that Puritan negotiated the Agreement through a series of telephone calls and e-mails into Massachusetts over the course of many months. Significantly, Puritan representatives traveled to and stayed in Massachusetts where they met ATG personnel, discussed the Project, and negotiated the Agreement. Upon entering into the Agreement, Puritan continued to regularly communicate with ATG managers in Massachusetts regarding the Project. Payments were made by Puritan to ATG in Massachusetts. Finally, Puritan terminated the Agreement by letter into Massachusetts. Clearly, Puritan's contacts with Massachusetts were numerous and integral to the formation, performance, breach and eventual termination of the Agreement.

Defendant argues that this court does not have jurisdiction because its contacts with Massachusetts were merely "incidental." Defendant largely relies on *Lyle Richards*, in which the court held that the court did not have jurisdiction under Mass. Gen. Laws ch. 223A, § 3(a) over an out of state defendant because the action did not arise from defendant's transaction of business in Massachusetts, and that the "purely incidental contacts [with Massachusetts] involved ... were insufficient to support an assertion of personal jurisdiction over [defendant]." 132 F.3d at 113. The court further explained that because "the extracontractual activities unilaterally undertaken by the respective parties in Massachusetts were extraneous to the formation of the Agreement, those activities did not constitute a 'but for' cause for the alleged breach of contract." *Id.* at 114 (citing *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 770, 625 N.E.2d 549, 553 (1994)) (internal citation omitted).

*Lyle Richards* is distinguishable from this action because here the contacts (discussed above) were "instrumental in the formation of the contract." *Hahn v. Vermont Law Sch.*, 698 F.2d 48, 51 (1st Cir. 1983) (nonresident law school transacted business by sending application for admission and notice of acceptance to plaintiff in Massachusetts). For instance, the defendant in *Lyle Richards* never visited Massachusetts during the course of the contract negotiations, whereas here Puritan personnel traveled to the forum to negotiate the Agreement with ATG and engaged in numerous pre-contract communications with ATG employees in Massachusetts. In *Lyle Richards*, most of the performance of the contact was to take place outside of

Massachusetts (132 F.3d at 113) while much of ATG's work was to take place in Massachusetts. The contacts in the instant case are more than sufficient to satisfy the relatedness prong of the jurisdictional analysis. *See Adams*, 601 F.3d at 8 (assuming that relatedness prong was satisfied where borrowed funds which. were reflected in promissory note were provided by Massachusetts resident who was a party to the note, and basis of suit was failure to pay note).

### 2. *Purposeful Availment*

 The evidence of Puritan's contacts with Massachusetts also fulfills the purposeful availment prong of the jurisdictional inquiry. "[T]he cornerstones upon which the concept of purposeful availment rest. are voluntariness and foreseeability." *Sawtelle*, 70 F.3d at 1391. This prong is satisfied "when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on these contacts." *Swiss Am. Bank, Ltd.*, 274 F.3d at 624. Therefore, where a party, through its interstate contractual obligations, " 'reach[es] out beyond one state and create[s] continuing relationships and obligations with citizens of another state[,]' " it is "subject to regulation and sanctions in the other State for the consequences of [its] activities." *Burger King*, 471 U.S. at 473, 105 S.Ct. at 2182 (quoting *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 647, 70 S.Ct. 927, 929, 94 L.Ed. 1154 (1950)).

Here, Puritan's execution of the Agreement, and subsequent entry into the Statements of Work created an obligation to pay ATG for various professional services rendered upon Puritan's request as well as fees for software support and maintenance. The nature of the Agreement created a continual relationship between the two parties (one of which was based in Massachusetts) until the relationship was terminated by notice from one party to the other. Due to the extensive negotiations between the parties and Puritan's visit to Massachusetts, there can be little doubt that defendant was well aware it was entering into a contract with a business operated out of Massachusetts. Therefore, it is clear that defendant deliberately reached out beyond New York to create a continuing relationship with a Massachusetts resident, thereby satisfying the voluntariness element of the purposeful availment test. *See Phillips Exeter Acad.*, 196 F.3d at 292 (evidence of voluntariness may be found where a defendant reaches into the forum to create a relationship with plaintiff).

 Puritan's contacts with the forum also made jurisdiction foreseeable. "The enforcement of personal jurisdiction over a non-resident defendant is foreseeable when that defendant has established a continuing obligation between itself and the forum state." *Sawtelle*, 70 F.3d at 1393. As noted above, the Agreement contemplates reciprocal obligations between the parties until one party actively terminated the Agreement. These obligations regarded not just the "professional services" which were largely performed in New York, but also the software license and related technical support, which was performed in Massachusetts. Moreover, because "defendant's contacts are central to *each* prong of the tripartite analysis" the extensive negotiations between the parties tends to show that defendant "reached into" Massachusetts, and therefore jurisdiction was foreseeable. *See Adams*, 601 F.3d at 7 n. 10. Accordingly, the plaintiffs have made the showing necessary to satisfy the purposeful availment requirement of the jurisdictional test.

### 3. *Gestalt Factors*

■■■■■] The application of the Gestalt factors to the facts of this case further weighs in favor of exercising personal jurisdiction over the defendants. The most important element is the first: the defendant's burden of appearing. *See Ticketmaster–New York, Inc.,* 26 F.3d at 210. Of course, defending an action in a foreign jurisdiction "is almost always inconvenient and/or costly . . . this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." *Pritzker v. Yari,* 42 F.3d 53, 64 (1st Cir. 1994), *cert. denied,* 514 U.S. 1108, 115 S.Ct. 1959, 131 L.Ed.2d 851 (1995). Here, Puritan asserts no special burden it would encounter in litigating out of state, nor does the record reveal a greater burden on Puritan appearing in Massachusetts than ATG would suffer appearing in New York. Puritan does suggest that it would suffer because former employees who currently live in New York may be called as witnesses. However, they may appear by deposition if necessary and there is no guarantee that all persons involved on behalf of ATG will remain Massachusetts residents until trial. The burden on Puritan is not so significant as to challenge "traditional notions of fair play and substantial justice." Therefore, Puritan has not demonstrated any special burden that would accompany its obligation to defend this case here. *See Workgroup Tech. Corp. v. MGM Grand Hotel, LLC,* 246 F.Supp.2d 102, 115 (D.Mass.2003) (for first Gestalt factor to have significance, defendant must show that "the exercise of jurisdiction in the present circumstances is onerous in a special, unusual, or other constitutionally significant way.").

■■■] The next factor to consider is the forum state's interest in adjudicating the dispute. "A State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King,* 471 U.S. at 473, 105 S.Ct. at 2182–83. This factor weighs in favor of this court asserting personal jurisdiction, so ATG can assert its claim in its principle place of business, and because litigating this case here will pose minimal disruption to the employees of ATG.

■■■] The third Gestalt factor is the plaintiff's interest in obtaining convenient and effective relief. As such, "a plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience." *Sawtelle,* 70 F.3d at 1395. Certainly, it would be more convenient for the plaintiff to litigate its claims in a forum in which it operates, and in which key witnesses reside. Consequently, this factor weighs heavily in favor of this court exercising jurisdiction.

The remaining factors—the judicial system's interest in obtaining the most effective resolution of the controversy, and the common interests of all sovereigns in promoting substantive social policies—do not appear to weigh in favor or against exercising jurisdiction. To the extent this court is required to apply New York law pursuant to the choice of law provisions in the parties contractual agreements, it is capable of doing so. Nor does this case appear to raise social or policy issues of concern to Massachusetts or New York.[6]

In sum, the Gestalt factors that are relevant to this case support this court's assertion of jurisdiction over the out-of-state

---

**6.** Puritan argues that it is more efficient to litigate in New York for a variety of reasons. (*See* Def. Mem. at 19–20). These arguments are unpersuasive because they virtually all relate to the inherent difficulty of litigating out-of-state, and would be equally applicable to ATG in the event ATG is forced to litigate in New York.

defendants. Accordingly, the maintenance of this lawsuit against Puritan in Massachusetts "would comport with 'fair play and substantial justice.'" *Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184 (quoting *Int'l Shoe*, 326 U.S. at 320, 66 S.Ct. at 160). Because, as detailed above, the defendants also have sufficient "minimum contacts" with Massachusetts to support this court's exertion of specific jurisdiction over them, the defendants' motion to dismiss for lack of personal jurisdiction should be denied.

### B. *Motion to Dismiss for Improper Venue*

■■■■■ Puritan also moves to dismiss under Fed.R.Civ.P. 12(b)(3) and 28 U.S.C. § 1406(a) because there is "no basis for venue in the District of Massachusetts pursuant to 28 U.S.C. § 1391(a)." (Def. Mem. (Docket No. 24) at 9). The relevant part of the venue statute provides that "[a] civil action wherein jurisdiction is founded only on diversity of citizenship may ... be brought only in ... a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred...." 28 U.S.C. § 1391(a). Courts look "not to a single 'triggering event' prompting the action, but to the entire sequence of events underlying the claim." *Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 42 (1st Cir.2001).

In the instant case, such a review compels the conclusion that venue is proper in Massachusetts. As detailed above, the contract negotiations took place in significant part in Massachusetts, ATG performed a significant part of its duties in Massachusetts, extensive discussions took place in Massachusetts, payments were made into Massachusetts, and the contract was terminated through correspondence directed to Massachusetts. These facts, among others, make venue proper in Massachusetts.

■■■ This court recognizes that New York may also be an appropriate venue for this action. However, "venue may be proper in any number of districts." *Id.* Therefore, because, all the events relevant to the plaintiff's claim have at least some tie to the present venue, venue is proper in the present forum.

### C. *Puritan's Request to Transfer Venue*

■■■ Puritan argues that this court should exercise its discretion and transfer the present action to the Eastern District of New York pursuant to 28 U.S.C. § 1404(a). "Under § 1404(a), a district court may transfer any civil action to any other district where it may have been brought for the convenience of parties and witnesses, in the interest of justice." *Coady v. Ashcraft & Gerel*, 223 F.3d 1, 11 (1st Cir.2000) (internal quotations and punctuation omitted). Here, as a preliminary matter, it is clear that this action could have been brought in the Eastern District of New York. Nevertheless, this court recommends that the motion to transfer in this case be denied.

■■■ The purpose of section 1404(a) is "to prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616, 84 S.Ct. 805, 809, 11 L.Ed.2d 945 (1964) (internal quotations omitted). "Factors to be considered by the district court in making its determination include the convenience of the parties and witnesses, ... the availability of documents, and the possibilities of consolidation." *Cianbro Corp. v. Curran–Lavoie, Inc.*, 814 F.2d 7, 11 (1st Cir.1987). However, the burden of demonstrating that transfer is appropriate "rests with the party seeking transfer; there is a strong presumption in favor of the plaintiff's choice

of forum." *Coady*, 223 F.3d at 11. This presumption, as well as a review of the relevant factors in this case supports denial of the defendant's motion.

Puritan's arguments in support of venue transfer largely mirror arguments already disposed of above.[7] Any inconvenience suffered by Puritan in litigating in Massachusetts would apply to ATG if the matter were transferred to New York. The only difference on the present record is that there are two former Puritan employees who each reside in New York and who may be witnesses. (*See* Pappas Aff. at ¶ 18). This is a point in favor of transferring venue. *See Morson v. Kreindler & Kreindler, LLP*, No. 09-10199-RGS, 2009 WL 2032395, at *3 (D.Mass. July 10, 2009) (slip op.) (holding that transfer to New York was appropriate where plaintiff and possibly his wife were only witnesses residing in Massachusetts and there were over ten New York witnesses, many of whom were nonparties to the litigation); *Brant Point Corp. v. Poetzsch*, 671 F.Supp. 2, 5 (D.Mass.1987) (holding that transfer to North Carolina was appropriate where plaintiff was only Massachusetts resident compared to numerous non-party witnesses who were residents of North Carolina). However, this court finds that the convenience of two non-party witnesses is insufficient to outweigh the deference due to plaintiff's choice of forum, especially where, as here, a number of witnesses are based in Massachusetts. This court finds, therefore, that Puritan has not met its burden of showing that a transfer of venue is appropriate.

## IV. CONCLUSION

For the reasons stated herein, this court finds that the exercise of personal jurisdiction over the defendant Puritan in this case is consistent with the constitutional requirements of due process. This court further finds that venue in this court is appropriate and that defendant has not demonstrated that the action nevertheless should be transferred to New York. Therefore, this court recommends to the District Judge to whom this case is assigned that Puritan's motion to ·dismiss for lack of personal jurisdiction and venue, and its alternative motion to transfer venue (Docket No. 21) be DENIED.[8]

May 10, 2010

---

7. More specifically, Puritan supports its request with the following reasons: (1) convenience of witnesses; (2) applicability of New York law to the Agreement; (3) that the operative facts took place exclusively in New York; (4) that transfer would allow for consolidation of actions; (5) the interests of justice favor New York as the forum state; and (6) ATG's choice of forum is entitled to little or no deference because the material events occurred in New York. (*See* Def. Mem. at 11-15). Many of these arguments would be equally applicable to an ATG request to transfer venue from New York to Massachusetts, while others run contrary to this court's finding that key events relevant to the dispute took place in Massachusetts, and still others are of little consequence, such as the applicability of New York law to the Agreement.

8. The parties are hereby advised that under the provisions of Fed.R.Civ.P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule

shall preclude further appellate review. *See
Keating v. Sec'y of Health & Human Servs.,*
848 F.2d 271, 275 (1st Cir.1988); *United
States v. Valencia–Copete,* 792 F.2d 4, 6 (1st
Cir.1986); *Park Motor Mart, Inc. v. Ford Mo-
tor Co.,* 616 F.2d 603, 604–605 (1st Cir.1980);
*United States v. Vega,* 678 F.2d 376, 378–79
(1st Cir.1982); *Scott v. Schweiker,* 702 F.2d
13, 14 (1st Cir.1983); *see also Thomas v. Arn,*
474 U.S. 140, 153–54, 106 S.Ct. 466, 474, 88
L.Ed.2d 435 (1985). *Accord Phinney v. Went-
worth Douglas Hosp.,* 199 F.3d 1, 3–4 (1st
Cir.1999); *Henley Drilling Co. v. McGee,* 36
F.3d 143, 150–51 (1st Cir.1994); *Santiago v.
Canon U.S.A., Inc.,* 138 F.3d 1, 4 (1st Cir.
1998).